**UNITED STATES, Appellee,**

v.

**Specialist Four Terry W. EVANS, 304–66–3497, United States Army, Appellant.**

**CM 447204.**

U.S. Army Court of Military Review.

14 Nov. 1986.

ministrative credit for restriction tantamount to confinement is waived unless raised at trial.

Before DeFORD, WILLIAMS and KENNETT, Appellate Military Judges.

## OPINION OF THE COURT

KENNETT, Judge:

Tried by a general court-martial with officer members, appellant was convicted, contrary to his pleas, of rape, forcible sodomy,[1] and aggravated assault in violation of Articles 120, 125, and 128, Uniform Code of Military Justice [hereinafter cited as UCMJ], 10 U.S.C. §§ 920, 925, and 928 (1982), respectively. He was sentenced to a dishonorable discharge, confinement for life,[2] forfeiture of all pay and allowances, and reduction to the grade of Private E–1. The convening authority approved the sentence.

For Appellant: Lieutenant Colonel Paul J. Luedtke, JAGC, Major Eric T. Franzen, JAGC, Captain Lorraine Lee, JAGC (on brief).

For Appellee: Colonel James Kucera, JAGC, Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Thomas E. Booth, JAGC, Major Byron J. Braun, JAGC, Captain John F. Burnette, JAGC, Captain Susan E. Fine, JAGC (on brief).

On appeal, appellant alleges numerous errors, either personally[3] or through counsel. Four of these alleged errors, concerning the admissibility of hearsay statements made by the victim, appellant's four-year-old daughter, and the sufficiency of the evidence to sustain the rape and sodomy convictions, will be discussed. The remaining alleged errors, including those personally asserted by appellant, are without merit.

1. The specification alleged that appellant committed sodomy with "a child under the age of sixteen years, by force and without the consent of" the victim. Although we view this specification as alleging the offense of sodomy with a child under the age of sixteen, the trial counsel and the military judge characterized it as forcible sodomy, and the military judge instructed the members only as to the elements of forcible sodomy. The judge did not, however, amend the specification to delete the language alleging sodomy with a child, and appellant was found guilty as charged. We will correct this error in our decretal paragraph. It should be noted that, had appellant been acquitted of rape, the error noted above would have affected the maximum possible confinement. Appellant's crimes were committed on 3 April 1984; however, he was not tried and sentenced until after 1 August 1984 when the provisions of the Manual for Courts-Martial, United States, 1984 [hereinafter cited as MCM, 1984] became effective. Although forcible sodomy and sodomy with a child under the age of sixteen now include confinement for twenty years as part of the maximum punishment, MCM 1984, Part IV, para. 51e(1) and (2), there was a difference of ten years confinement between the two offenses under the Manual for Courts-Martial, United States, 1969 (Rev. ed.) [hereinafter cited as MCM, 1969] (twenty years for sodomy with a child under the age of sixteen, and ten years for forcible sodomy, MCM, 1969, para. 127c, Table of Maximum Punishments). Notwithstanding appellant's trial *after* the effective date of the MCM, 1984, the lower period of confinement (ten years) applied because his crime of "forcible" sodomy occurred prior to the effective date of the MCM, 1984. Executive Order 12473 as amended by Executive Order 12484.

2. The case was referred as capital because the victim of the rape was appellant's four-year-old daughter (the rape specification included the language "a female under the age of 16 years").

3. *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

## I. FACTS

Sometime on 3 April 1984, Chief Warrant Officer Two (CW2) David Vigeant received a telephone call at his place of duty, the Erlangen Health Clinic (Erlangen, Germany), from a "concerned father." The individual was crying, had a "whining voice," and seemed to CW2 Vigeant to be very upset. The individual related that his four-year-old daughter had fallen, sustaining a bloody nose and a bruise to the side of her face. CW2 Vigeant queried whether the child had lost consciousness, to which the caller replied "No." CW2 Vigeant then asked whether the girl was alert and acting "okay," to which the reply was "Yes." CW2 Vigeant told the caller there didn't seem to be "too much to worry about," but cautioned "Just watch her." The individual replied he was afraid "people" would think the child had been abused because of her appearance. CW2 Vigeant told him not to worry because "children oftentimes fall," but that, if the father was concerned about the child's health, he could bring her to the clinic. Later that day, CW2 Vigeant heard the father's voice in the clinic. He located the father in the hallway across from the treatment room. In the treatment room, CW2 Vigeant saw "a very frightened little girl" with "a large bruise that covered the whole right side of her face."

Between 0900–1000, 3 April 1984, Mr. William Moersch received a telephone call at his place of duty, the Emergency Room at the U.S. Army Hospital, Nuernberg, Germany. The caller identified himself as either Sergeant or Specialist Evans, and told Mr. Moersch that his four-year-old daughter, Michelle, had fallen down some stairs earlier that morning, sustaining a "facial head injury." The caller informed Mr. Moersch that he had already discussed the "situation" with the Erlangen Clinic, and Mr. Moersch asked why he was now calling the Emergency Room. As the conversation progressed, the caller stated that the child was bleeding from the vagina: Mr. Moersch asked, "[C]ould this have happened ... in the fall?" The caller replied, "[N]o, ... he did not feel that ... was a possibility at all." He stated no other children were present. He then asked Mr. Moersch whether the child could be starting her menstrual cycle, as the child's mother had begun her cycle at age nine. Mr. Moersch replied that such an occurrence would be very unlikely in a four-year-old. As the two men continued to talk about how the bleeding had started, the caller became "considerably more anxious, sobbing intermittently, somewhat less coherent." Suddenly, the caller stated, "It looks like she's been screwed." As that comment seemed "totally out of the context ... of the conversation" they were having, Mr. Moersch asked the caller for an explanation. The individual stated his wife and child had been molested on one occasion in the past when he was not at home, and he reiterated his belief that the bleeding did not result from the fall on the stairs. Mr. Moersch advised him to bring the child to the Emergency Room in Nuernberg. The caller did not resist the advice. Sometime in "early mid-afternoon" that same day, the child was brought to the Emergency Room.

At approximately 1200, 3 April 1984, Mr. John Doherty, a nurse at the Erlangen Dispensary [Health Clinic] heard a "commotion" at the emergency entrance to the facility. He then saw appellant enter the building carrying a girl in his arms. Appellant asked for help and was escorted to the treatment room. Upon entering the treatment room, Mr. Doherty noticed a bruise on the right side of the child's face. Mr. Doherty also noted that, for a child with an injury, the girl and her clothes were "very clean." [4] Upon inquiry by Mr. Doherty concerning what happened to the child, appellant initially stated that she had fallen down the stairs. Appellant then asked whether the girl could be having her "period," stating she was bleeding from "down

---

**4.** Appellant told Mr. Doherty the child had been wearing a nightgown or pajamas at the time of the injury; when she was brought to the dispensary, the girl was wearing a dress or "some type of ... outfit" which was not a nightgown.

there" while pointing to his own genital area. He said that three hours had elapsed from the time the girl had fallen until he noticed the blood from "down there" when she went to the bathroom. Appellant told Mr. Doherty that a German doctor had examined the child. During the conversation between appellant and Mr. Doherty, appellant was "at ... times ... real quiet" and, at other times, "babbling, rambling." Mr. Doherty also characterized appellant's speech as a "whining-type" mumble. In the treatment room, Mr. Doherty removed a rag, face cloth, or dish towel from between the child's legs, and replaced the cloth with a sterile pad. he then asked a doctor to examine the girl. During the examination, Mr. Doherty saw what appeared to be a tear in the child's vaginal area. The child appeared to be "detached," saying in a rhythmatic cadence, "I fell down the stairs, I fell down the stairs, I fell down the stairs." This statement would be made when the child was asked a question, but also when she was not asked anything. The child would also "drift off" and not answer questions. Although she whined "a little bit," the child "didn't cry a lot." She was transferred to the hospital in Nuernberg shortly after her mother arrived at the dispensary.

Doctor (Lieutenant Colonel) Lowry Shropshire was on duty at the pediatrics clinic, U.S. Army Hospital, Nuernberg, on 3 April 1984. Shortly after lunch that day, Dr. Shropshire saw a female child being wheeled down the hall. He noticed a "very large bruise" on her face. He saw the child's name, Michelle Evans, on an x-ray slip, and noticed that appellant was accompanying her. Dr. Shropshire examined the child and discovered that the fresh facial bruise was "quite extensive, going from her cheek up into her hairline, extending from her nose back to her ear." There was a small amount of dried blood in her nose. The examination was otherwise normal until Dr. Shropshire saw the child's genitalia, where he found "striking evidence of injury." There was a severe tear or laceration of her vagina, with fresh blood oozing from the wound, and some clots visible. Dr.

Shropshire discontinued his examination at this point and went to talk to appellant in an attempt to obtain a medical history of the girl's injury preparatory to her hospital admission. Appellant related he had been home sick that morning, and that Michelle and her five-year-old brother had been home with him. Appellant was half-asleep on the living room couch when he heard a loud noise. Upon investigation, he found Michelle lying at the foot of the stairs in the apartment. She had a large bruise on her face. He took her upstairs to a bedroom and then left to get a "medic" to examine her. The "medic" examined Michelle and told appellant that "basically she was okay." Appellant told Dr. Shropshire that Michelle later went to the bathroom and "came out screaming that her pee pee hurt, and there was blood." Appellant then saw that Michelle had an injury near her vagina and he took her to the Erlangen dispensary. During appellant's recitation of the circumstances surrounding Michelle's injury, he stopped, approximately half-way through the recitation, and asked Dr. Shropshire, "You don't think I did this, do you?" Appellant also asked Dr. Shropshire a number of questions concerning Michelle's medical course of treatment. Appellant's attitude and questions led Dr. Shropshire to conclude that it was necessary to call appellant's commander to gain appellant's permission for further examination and treatment of Michelle. After speaking with his commander, appellant gave permission for Michelle to be operated upon. Dr. Shropshire then consulted with Dr. Mayer, the obstetrician/gynecologist who was on duty that day.

Later that evening, Michelle was examined under anesthesia by Dr. Shropshire and Dr. Mayer. The bruise to Michelle's face reflected the outline of two fingers on her right temple. This fresh bruise was inflicted by a very significant, potentially lethal force. The bruise was not consistent with a fall down stairs nor with a blow from a five or six-year-old child. The injury to Michelle's vagina consisted of a V-shaped laceration which extended deep into

her vagina and backward toward her rectum, and included the rectal muscle.[5] She also had bruises on her inner thighs and over her pubic area. Neither the vaginal injury nor the pubic area bruising were consistent with a fall down stairs; however, the vaginal injury was consistent with penetration by an object, to include a penis, and the bruising was consistent with a sexual intercourse position with a person laying on top of the child. The rectal injury, which was exhibited by an abnormal, dilated rectum, and tears radiating from the anus, was consistent with penetration of the rectum. If the child had impaled herself on something during a fall, the excruciating pain would have rendered her unconscious. Another person would have seen a foreign object and would have had to remove the child from the object.[6] It was very unlikely that Michelle inflicted the vaginal injury upon herself by inserting an object into her vagina, because the pain involved would have been too great.[7] Additionally, Michelle would not have ignored the vaginal injury and continued to play, as "she would have [had] a significant amount of pain."[8]

Dr. (Major) Alan Mayer, the Chief of the Obstetrics and Gynecology Service, U.S. Army Hospital, Nuernberg, on 3 April 1984, was on duty that evening and was asked by Dr. Shropshire to examine a potential [suspected] sexual assault victim who was now a patient on the Pediatric Ward. As Dr. Mayer approached the nurses' station in that ward to examine the patient's chart, he observed appellant, later identified as the patient's father, "shouting and creating a disturbance about the chart." After learning that appellant was the patient's father, Dr. Mayer attempted to calm him. Knowing that he needed to obtain a medical history on the patient, Dr.

Mayer assured appellant that "whatever problem he had" would be taken care of, and he then attempted to secure the medical history from appellant. Appellant related that Michelle had fallen on the stairs outside their apartment. Appellant had picked her up and brought her back into the apartment. Michelle went upstairs to the bathroom and "came running out, saying her pee-pee was bleeding." Appellant saw that she was bleeding and took her to a downstairs apartment to be examined by a civilian physician. That physician said there was nothing wrong, but appellant, being cautious, took Michelle to the health clinic, which referred her to the Emergency Room. In answer to Dr. Mayer's questions, appellant stated that Michelle had not been unconscious and there were no objects found in her vagina. As Dr. Mayer was concluding the interview, appellant stated, "Doc, I don't know how to say this in medical terms and so I'll just say it. My wife's sitting here. She's the mother of two children. The last one was delivered without an episiotomy,[9] and she has trouble taking me, so how do you think my daughter could?" Upon concluding the interview, Dr. Mayer went to the examining room where he saw Michelle for the first time. She appeared to be shy and intimidated by his presence. As his normal procedure was to obtain a medical history from the patient, followed by a physical examination, Dr. Mayer engaged in general conversation with Michelle, trying to make her feel comfortable with him. The medical history she gave was "intermittent and kind of haphazard." She told Dr. Mayer she had fallen on the stairs, her father had picked her up and "hit her real hard." She also stated her father had put a lotion "on her pee-pee and her butt and that there was a lot of blood." In reply to Dr. May-

5. Dr. Mayer testified that the vaginal injury suffered by Michelle was comparable to that sustained in a very traumatic, uncontrolled child birth in which a large baby rips and tears through tissues which cannot dilate or expand any further.

6. Dr. Mayer's testimony, Record at 759.

7. Dr. Mayer's testimony, Record at 760.

8. Dr. Mayer's testimony, Record at 768.

9. A surgical incision of the vulvar orifice for obstetrical purposes. Webster's Third New International Dictionary 765 (unabridged) (1981) [hereinafter cited as *Webster's*].

er's question whether she hurt, Michelle denied any pains. He tried unsuccessfully to examine her genital area, and, not wanting to force her into an examination, decided to continue with Michelle under anesthesia.

After completing a surgical repair of Michelle's injuries, Dr. Mayer talked with her parents to advise them of his findings, the surgery, and the future course of Michelle's treatment. He told the parents that Michelle "had received a very, very serious penetration injury to her vagina ... there was significant extension of this tear back to her rectum ...," and that Michelle's post-operative care would be "very protracted." This care would include long-term evaluation to ensure the absence of scar tissue and "dysfunction." Additionally, Michelle would need "intense psychological and emotional support." Appellant's response to Dr. Mayer's information and advice was disconcerting to Dr. Mayer, as appellant did not ask about Michelle or her needs, but rather "continuously asked ... questions about himself and his role." Dr. Mayer became "frustrated" by appellant's questions and told appellant that he needed to "redirect his thoughts away from himself and his role and, more appropriately, onto his daughter and her care and her course and her recovery."

Captain (CPT) Gale Ford, the Head Nurse on the Pediatric Ward, U.S. Army Hospital, Nuernberg, on 3 April 1984, was on duty when Michelle was admitted to the ward sometime between 1400–1515. At that time, Michelle was "extremely agitated, upset, crying, screaming ... very, very distraught." CPT Ford was unable to obtain Michelle's vital signs (temperature, pulse, respiration, height, weight) because of the girl's emotional condition, so CPT Ford sat beside her and attempted to calm her. Approximately 30–40 minutes elapsed before Michelle was calmed. When CPT Ford then asked Michelle "how that had happened," indicating the bruise on the child's face, Michelle "kind of shied away and just said: 'Daddy hurt me.' " Her vital signs were then obtained. To this point, only female personnel had been in the room. When Dr. Shropshire, a male, entered the room, Michelle "again started screaming, hollering, crying, just was, again, very agitated and upset and distraught."

On 6 April 1984, CPT Ford was giving Michelle a sitz bath, a nursing procedure in which the perineal area [10] of the female is placed in water. The water is then swished around the perineal area to cleanse and soothe. During the bath, CPT Ford asked Michelle whether she was feeling better, "meaning if the sitz bath was helping her," and Michelle replied, "Yes, it feels better, just like when my Daddy took it out." CPT Ford asked, "Well, what do you mean by that?", to which Michelle replied, "[T]he thing with the pink lotion or pink oil on it."

During the same week that Michelle was admitted to the hospital, appellant was subsequently admitted as a patient to the Psychiatric Ward of the same hospital. On 5 April 1984, while a patient on the ward, appellant received a telephone call from his wife.[11] Mrs. Beverly Sledge, an employee on the ward, received the call, brought appellant to the phone at the nurse station, and, as patients were not to be left alone in the office, stepped into the next office a few feet away until appellant was finished with the call.[12] Mrs. Sledge overheard the following portion of the conversation: Appellant asked, "[I]f she'd gotten rid of everything." After a pause, appellant said

10. The perineum is the area between the anus and the external female genitalia. *Webster's* at 1680.

11. Although Mrs. Sledge, the employee who answered the phone, could not remember the precise date the call was received, she testified the date was "the day before the CID [U.S. Army Criminal Investigation Command] came to pick up his [appellant's] clothes." Record at 777.

Prosecution Exhibit 11, an Evidence/Property Custody Document (Department of the Army Form 4137) reflects appellant's clothing was seized at 1630, 6 April 1984, from the Psychiatric Ward.

12. Mrs. Sledge testified the "only" two phones "there," apparently referring to the ward, were both in the same office.

not to "worry about that because that happened sometime when we were in the bed having sex." After another pause, appellant stated, "I gave her a bath and washed the blood off of her and her hair. She wouldn't stop bleeding, so I took her to—I had to take her to the ER." Thereafter, appellant said, "Just get rid of her. I'll do my time and everything will be all right, but just get rid of her."

Doctor (Ph.D.) Renee Frederickson, a civilian psychologist, testified for the government as an expert witness "in the field of psychology and specifically in the areas of preschool sexual abuse victims as well as adult sexual abusers." Dr. Frederickson conducted diagnostic and treatment interviews with Michelle for approximately seven days commencing on 19 November 1984. In testimony which synopsized what Michelle told and showed her during the interviews, Dr. Frederickson related the following: Michelle said, "My daddy hurt me, but not anymore." When asked how her daddy hurt her, Michelle responded he placed his "pee-pee ... in her pee-pee," pointing to her genital area, and he also placed his penis in her rectum. Michelle stated she bled and cried. She told her father she needed to "go potty," even though she did not have to use the bathroom, because she "wanted him to quit." Using anatomically correct dolls, Michelle placed the female doll on its back with the male doll (which Michelle occasionally called the "mean doll") on top of the female, with the penis in the vaginal area. Michelle then turned the female doll on its stomach and placed the male doll on top of the female. Michelle also demonstrated a position characterized by Dr. Frederickson as a "spoon position" with the female doll curved and the male doll curved around the female, front to back, with the penis in the female's rectal area. Michelle related that appellant had called her brother, Brian [five-years-old], into the room and had Brian lay his penis on her vaginal area. Michelle stated, "Brian has a penis, but it doesn't hurt like my daddy's." She related her father's penis was hard and that Brian's was soft. She stated her father's penis had blood on it. Her father had showered her "afterwards" and he had also washed Brian. Michelle stated her father had hit her in the face, but she also said she fell down the stairs and he had not hit her.[13]

Various items of evidence were submitted to the CID laboratory for analysis. No "sperm or semen" were found in Michelle's vulva, vagina, cervix, or rectum (Defense Exhibit K, a Stipulation of Fact); however, the bodily fluid samples from these areas of Michelle's body did give a chemical indication for blood. The clothing worn by appellant when he took Michelle to the hospital revealed one seminal stain[14] on the bottom front center of the T-shirt, and a chemical indication of semen[15] on the front center area of the underwear and also on the inside right crotch area and the inside top center of the waistband of the trousers. One seminal stain was found on a towel seized from the washing machine in appellant's apartment. Human bloodstains on this towel, as well as on several other items of evidence[16] from the apartment, could have come from Michelle or an individual with her blood profile, but could not have been made by appellant as the bloodstains did not match his blood profile. A chemical indication of blood was found on a washcloth and in a solvent (located in a

---

**13.** Dr. Fredrickson testified that denial or recantation was one of the symptoms of preschool sexually abused children. She stated that inconsistencies were "certainly expected," and she would be "very suspicious if a preschooler were consistent and reliable."

**14.** The forensic serologist testified "seminal stain" meant that "spermatazoa" are present in the stain.

**15.** The forensic serologist testified "chemical indication of semen" does not mean the stain

itself is semen, as "[a] chemical indication is just a color test. It's a presumptive test which means it may be semen."

**16.** A piece of tissue found in the wastebasket in the living room; a fitted bedsheet from the washing machine; a cotton-tipped swab of a bloodstain located on the bathroom floor next to the washing machine; and a washcloth found on the bathroom floor.

plastic container), both found on the dining room table in the apartment. No blood or semen were found on the panties, shirt or skirt worn by Michelle when she was brought to the hospital; however, the washcloth which had been placed between her legs contained human bloodstains which could not be blood-typed. This washcloth did not reveal the presence of semen. Human bloodstains which could not be blood-typed were found on the underwear worn by appellant, and on items of evidence [17] from the apartment. Appellant's underwear also revealed the presence of mineral oil, which is a prime ingredient of Johnson's Baby Oil. A pink-topped bottle of this oil was seen on the sink in the apartment's bathroom, but was not seized as the criminal investigator was searching for a "pink lotion." No blood-stained toys or similar small items were found in the apartment, and no "toys or objects" were found on the apartment stairs or at the bottom of those stairs.

Michelle did not testify at trial. During the sentencing portion, however, the defense brought her into the courtroom, along with her foster mother, and engaged in a dialogue with the child. Michelle was not sworn as a witness and the dialogue involved approximately twenty questions and answers, such as:

> DDC [Detailed Defense Counsel]: Who is this? (Defense Counsel pointing to a stuffed animal held by the child.)

> Michelle: Lovealot.

> . . . . .

> DDC: Lovealot, who gave you Lovealot?
> Michelle: Santa.
> DDC: When did you get to see Santa Claus?
> Michelle: This month.

> . . . . .

> DDC: I just wanted to give these people a chance to meet you too, cause I'm sure they'll think you're a real nice little girl.
> DDC: What do you like to do Michelle?
> Michelle: (Shrugging her shoulders).
> DDC: Do you like to go outside and play?
> Michelle: (Nodding her head in the affirmative).

## II. MILITARY JUDGE'S RULINGS ON EVIDENTIARY OBJECTIONS

At trial, the defense moved to exclude Dr. Frederickson's entire testimony, asserting, generally, that statements made to a psychologist are not admissible under the "medical diagnosis or treatment" exception to the hearsay rule,[18] and, specifically, that the exception did not apply in this case because "Dr. Frederickson's evaluation and analysis of Michelle was primarily if not solely for the purpose of trial preparation and not for medical diagnosis or treatment."[19] The military judge considered

---

17. Two washcloths found in the washing machine, and a piece of carpet from the living room.

18. Manual for Courts-Martial, United States, 1984, Military Rules of Evidence 802 and 803(4). Rule 802 provides: "Hearsay is not admissible except as provided by these rules or by any Act of Congress applicable in trials by court-martial." Rule 803 provides, *inter alia:*
    The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (4) *Statements for purposes of medical diagnosis or treatment.* Statements made for purposes of medical diagnosis or treatment and describ[ing] medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

19. Appellate Exhibit XXVII. The parties stipulated that Michelle did not receive any psychiatric care from 3 April 1984 (when she was brought to the hospital with her injuries) until she was initially seen by Dr. Frederickson (on 19 November 1984). Record at 259. We note the initial consultation date (19 November 1984) was after two preliminary court sessions, UCMJ, art. 39(a), 10 U.S.C. § 839(a), had been held (2 October and 1 November 1984) and was less than one month from the date (11 December 1984) the government began its presentation of the case on the merits before the court members. While Dr. Frederickson had previously worked for the U.S. Army in Germany, at the time of her consultations pertinent to this case, she was working in St. Paul, Minnesota, and was brought to Germany at government expense to interview Michelle. Finally, Dr. Frederickson stated her goals in working with Michelle were threefold:

two written reports [20] submitted by Dr. Frederickson, one of which included the following paragraph:

> In diagnosing and treating Michelle, it is necessary to discuss with her how she received her injuries and who inflicted them on her. This is necessary because the child's discussion of the abusive incidents is invaluable in determining the veracity of the child, the severity of the trauma, and whether one must treat for incestuous assault, acquaintance or stranger rape, for damage and dynamics differ in each of these three cases. It is also necessary to discuss, the incidents for treatment purposes because the debriefing process offers considerable long-term relief of feelings and symptoms. The debriefing process also allows misconceptions the child has about the assault, the nature of a relationship to the abuser, and the role of sex to surface for intervention and treatment.

The judge ruled Michelle's statements to Dr. Frederickson were admissible under Military Rule of Evidence 803(4), the medical diagnosis or treatment exception to the hearsay rule.[21]

At trial, the defense also moved to exclude CPT Ford's testimony concerning the statements Michelle made to her on 3 April and 6 April 1984. The judge ruled the statements were admissible under Mil.R.Evid. 803(4), and, additionally, the statements on 6 April (made by Michelle during the sitz bath) were also admissible under Mil.R.Evid. 803(1), the present sense impression [22] exception to the hearsay rule.

## III. ADMISSIBILITY OF MICHELLE'S STATEMENTS

■ The trial judge ruled Michelle's 6 April statement to CPT Ford was admissible as an exception to the hearsay rule under Mil.R.Evid. 803(1), a present sense impression. This exception provides a statement is not excludable as hearsay if it is:

> A statement describing or explaining an event or condition made while declarant was perceiving the event or condition or immediately thereafter.

Mil.R.Evid. 803(1).

This rule of evidence, taken verbatim from the federal rule,[23] is based on the underlying theory that substantial contemporaneity of event and statement negative the likelihood of misrepresentation.[24] Contrary to appellant's assertion, the event in question need not be "startling." *McCormick*, at 860–61 (unexcited statements of present sense impression). What is required is a description or explanation of an event made while the declarant is perceiving the event, or immediately thereafter. *McCormick* at 862. *See United States v. Hinton*, 719 F.2d 711 (4th Cir.1983), *cert. denied*, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984); *State v. Flesher*, 286 N.W.2d 215 (Iowa 1979).

Here, Michelle was placed in a sitz bath intended to ease the pain of her wounds.

---

One, to evaluate and diagnose the child as a possible physical and/or sexual abuse victim and determine, you know, the veracity of her story or to see if there were accompanying symptons [sic] that would justify a diagnosis of—or an opinion of sexual abuse or physical abuse; to evaluate her potential as a reliable witness in her own defense and also to evaluate....

> Q. Have you conducted interviews with her for the purpose of diagnosis and treatment?
> A. Yes, I have.

Record at 824–25.

**20.** Appellate Exhibits XXIII and XXIV.

**21.** See n. 18, *supra*. At trial, the defense did not lodge a sixth amendment confrontation clause objection to Dr. Frederickson's testimony.

**22.** Mil.R.Evid. 803(1) describes "present sense impression" as "A statement describing or explaining an event or condition made while declarant was perceiving the event or condition or immediately thereafter."

**23.** Manual for Courts-Martial, United States, 1984, Analysis of Mil.R.Evid. 803(1), App. 22, A22–48.

**24.** Saltzburg and Redden, *Federal Rules of Evidence Manual* 915 (1986); Cleary, *McCormick on Evidence*, § 298 at 860 (1984) [hereinafter cited as *McCormick*].

When asked if she was feeling better—after being placed in the bath—Michelle responded. This response, "Yes, it feels better, just like when my Daddy took it out," was made contemporaneously, if not instantaneously, with the event then being perceived—the bath. The spontaneity of the statement in relation to the bath attests to its trustworthiness. *Cf. United States v. Earley*, 657 F.2d 195, 198 (8th Cir.1981) (spontaneity of statement to phone call). We do not believe, therefore, the trial judge abused his discretion in admitting the evidence.

Appellant additionally asserts Michelle's 6 April statement to CPT Ford was inadmissible under Mil.R.Evid. 803(4), the medical diagnosis or treatment exception. That rule provides certain statements are not excluded by the general hearsay proscription if they are:

> Statements made for purposes of medical diagnosis or treatment and describ[ing] medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Mil.R.Evid. 803(4).

■ Appellant argues two theories of inadmissibility. First, appellant contends the status of CPT Ford as a nurse is beyond the purview of the rule. We disagree. Rule 803(4) is taken verbatim from Fed.R. Evid. 803(4). M.C.M.1984, Analysis of Mil. R.Evid. 803(4), App. 22, A22–48. When interpreting the scope of the military rules of evidence, we are instructed to interpret our rules consistently with those in the federal civilian scheme. Mil.R.Evid. 101(b)(1). The rationale behind Fed.R.Evid. 803(4) is that the declarant's motive guarantees her trustworthiness: the declarant has a motive to tell the truth because treatment will depend on what is said. Weinstein and Berger, *Weinstein's Evidence*, para. 803(4)[01], 803–144 (1985) [hereinafter cited as *Weinstein* ]. Because of this motive to promote diagnosis or treatment, Fed.R.Evid. 803(4) does not require the statement to be made to a physician.

*Weinstein* at 803–145. In fact, the Advisory Committee's Notes to the rules indicate "[s]tatements to hospital attendants, ambulance drivers, or even members of the family might be included." Rothstein, *Federal Rules of Evidence*, Advisory Committee's Note, 388 (1985). *See Ellis v. International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir.1984) (statement to nurse and physician). *Cf. United States v. Quick*, 22 M.J. 722, 724 (A.C.M.R.1986) (statement to babysitter admissible under Mil.R.Evid. 803(24) because it approximated a statement admissible under Mil.R.Evid. 803(4)). We believe statements made to a nurse may be deemed admissible under Mil.R.Evid. 803(4).

■ Appellant also asserts that, because the statement did not promote medical diagnosis or treatment, Mil.R.Evid. 803(4) will not permit the statement's admission. Appellant is correct that this is the critical requirement for admissibility under Mil.R. Evid. 803(4). Our review of the record, however, convinces us Michelle's statement to CPT Ford was reasonably pertinent to medical treatment and, therefore, satisfied the requirements for admissibility under Mil.R.Evid. 803(4).

As previously described, the statement in question occurred on 6 April. Only three days earlier, Michelle had been severely injured. The severe laceration of her vagina, which extended deep into the vagina toward the rectum and which included the rectal muscle, had been repaired surgically. Dr. Mayer, in a post-operative discussion with appellant, indicated post-operative care was required and would be "very protracted."

■ CPT Ford testified as to the post-operative treatment given Michelle. Part of the procedure required in Michelle's case was to place Michelle in a sitz bath. The purpose of this treatment was to ensure that the perineal area was kept clean and lubricated. The sitz bath would also act to "comfort" the wound. During one of these sitz baths, CPT Ford asked Michelle how she was doing. The purpose of this questioning was to find out how well Michelle

was progressing. It was then that Michelle said, "Yes, it feels better, just like when my Daddy took it out." The fact that Michelle responded to a question does not alter the admissibility of the statement. In fact, if medical personnel were precluded from inquiring of patients whether treatment was effective, required treatment would be hampered and the rationale behind the hearsay exception obfuscated. Importantly, CPT Ford stated that Michelle's responses to treatment were an important part of Michelle's medical history, and *would be relayed to Michelle's doctors.* The contested statement fits squarely within the exception provided by Mil.R.Evid. 803(4).

■ Although not raised by appellant, admission of Michelle's statement to CPT Ford at first glance seems to raise a sixth amendment confrontation issue.[25] We believe no confrontation issue exists for several reasons. First, no confrontation objection was made at trial. Without objection to the declarant's unavailability, *see Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), appellant has waived the issue. *See United States v. Rousseau,* 21 M.J. 960, 967 (A.C.M.R.), *petition granted,* Dkt. No. 54,764/AR (C.M.A. 8 Oct. 1986); *United States v. Gibbs,* 739 F.2d 838, 847 (3d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). Unless specific objection is required, we believe the issue may fall prey to gamesmanship. Defense counsel could fail to contest the issue at trial, thereby ensuring an issue on appeal. Further, we note, during sentencing, the defense team introduced Michelle to the court members. She was, therefore, available and within the vicinity of the courtroom.[26] *See Quick,* 22 M.J. at 725. It may have been, how-

ever, that both trial counsel and the defense team believed that Michelle's presence would have been futile, as she may have been an "unexpressive and inarticulate witness." *Quick,* 22 M.J. at 725. It may well have been a conscious decision by the defense team not to require Michelle's presence on the merits.[27] *See Quick,* 22 M.J. at 727 n. 4. Often, testimony before the members from a witness such as Michelle can be particularly damaging.

Finally, the Supreme Court has recently indicated that the government need not always show unavailability when it seeks to introduce an out-of-court statement against an accused. *United States v. Inadi,* — U.S. —, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). Although the sixth amendment right to confrontation and the general proscription against hearsay have not been deemed coextensive, we do not believe the availability of Michelle would add anything to "the truth-determining process." *Inadi,* 106 S.Ct. at 1127. Further, because Michelle's statement to CPT Ford fit within not one but two hearsay exceptions, we deem the testimony sufficiently trustworthy for sixth amendment concerns.

■ Appellant asserts the trial judge erred when he admitted into evidence under Mil.R.Evid. 803(4) hearsay statements made by Michelle to Dr. Frederickson. Recently, in a case with facts similar to the facts here, the Court of Military Appeals discussed the admissibility of victim statements made to a psychiatrist. *United States v. Deland,* 22 M.J. 70 (C.M.A.1986). In *Deland,* the court, although affirming the determination that the statements in that case were admissible, set out specific guidance concerning statements similar to those made by Michelle to Dr. Frederickson: In particular, the evidence may not be

**25.** On appeal, appellant has contested Michelle's statements to Dr. Frederickson on confrontation grounds. The confrontation objection, however, was not made at trial. We have disposed of the statements to Dr. Frederickson on evidentiary grounds, *infra.*

**26.** It seems, therefore, the *"opportunity* for cross-examination at trial" was present. *See California v. Green,* 399 U.S. 149, 168, 90 S.Ct.

1930, 1940, 26 L.Ed.2d 489 (1970) (emphasis added).

**27.** *See United States v. Cree,* 778 F.2d 474 (8th Cir.1985) (waiver of confrontation right where declarant, a *four-year-old,* was physically present at trial but defense declined to call declarant as a witness) (emphasis added).

considered if the examination of the victim was more oriented to testifying at trial than to medical diagnosis or treatment. *Deland,* 22 M.J. at 75. The record here does not sufficiently demonstrate that Michelle's psychological examination with Dr. Frederickson was more oriented to diagnosis or treatment versus trial preparation.[28] Additionally, the government did not proffer evidence which established that four-year-old Michelle made the statements to Dr. Frederickson with some expectation of receiving medical benefit from the diagnosis or treatment, another requirement of *Deland. Deland,* 22 M.J. at 75. Under the analysis of *Deland,* therefore, Michelle's statements to Dr. Frederickson must be deemed inadmissible (this includes Michelle's actions with the anatomically correct dolls).

### IV. CONCLUSION

We must now consider whether the above error materially prejudiced a substantial right of the appellant. UCMJ art. 59(a), 10 U.S.C. § 859(a). Because the error was not of constitutional dimension, the error "may be found harmless only upon the determination either that the finder of fact was not influenced by it, or that the error had but a slight effect on the resolution of the issues of the case." *United States v. Barnes,* 8 M.J. 115, 116 (C.M.A. 1979). In making this determination, we must consider all admissible evidence produced at trial. During this process, we necessarily consider appellant's fourth assignment of error, that is, whether the admissible evidence at trial is sufficient to sustain appellant's convictions of rape and forcible sodomy. We find as fact, UCMJ art. 66(c), 10 U.S.C. § 866(c), that there is more than sufficient evidence, disregarding the inadmissible statements, to sustain the convictions, and that the inadmissible evidence had but a slight effect on the resolution of the issues of the case. A mere cursory reading of the admissible evidence, which we have restated in the lengthy factual statement earlier in this opinion, suf-

fices to convince us of appellant's guilt beyond a reasonable doubt.

The Court affirms only so much of the findings of guilty of the Specification of Charge II and Charge II as find that appellant did, at the time and place alleged, commit sodomy with Michelle R. Evans by force and without the consent of the said Michelle R. Evans, in violation of Article 125, UCMJ. The remaining findings of guilty and the sentence are affirmed.

Senior Judge DeFORD and Judge WILLIAMS concur.