UNITED STATES

v.

**Senior Airman Troy D. HUGHES, FR451–35–3671, United States Air Force.**

**ACM 32359.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 1 June 1996.

Decided 29 May 1998.

Appellate Counsel for Appellant: Colonel David W. Madsen, Lieutenant Colonel Kim L. Sheffield, and Major Carol L. Hubbard.

Appellate Counsel for United States: Colonel Theodore J. Fink, Lieutenant Colonel Michael J. Breslin, and Captain Mitchel Neurock.

Before SNYDER, GAMBOA, and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

GAMBOA, Judge:

The appellant was convicted by a general court-martial consisting of members, contrary to his pleas, of committing indecent acts on two females under the age of 16 by

fondling them and placing his hands on their private parts with intent to gratify his sexual desires. Article 134, UCMJ, 10 U.S.C. § 934 (1994). The appellant was sentenced to a dishonorable discharge, confinement for 8 years, forfeiture of all pay and allowances, and reduction to the grade of E–1. He asserts 11 assignments of error which raise 17 issues.

## I. BACKGROUND

On Super Bowl Sunday, 28 January 1996, the appellant, his wife, and their 2–year–old son attended a party at the on-base quarters of Staff Sergeant DI, his wife, and their two daughters, ALI (age 6) and MJI (age 4). Several other adults, as well as two boys, ages 6 and 3, were also present. Toward the end of the first quarter, the appellant asked if he could lay his son, who had fallen asleep, in Mrs. DI's bed. About 15 minutes later, the appellant's wife, Mrs. Hughes, noticed he had not returned to watch the game and found him playing with the children in ALI and MJI's bedroom. The appellant's wife checked on the appellant and children several times throughout the game and offered to watch the children an offer rejected by the appellant. The appellant stayed with the children except for a brief period when he returned to the living room for a drink during halftime.

Mrs. DI testified that after the game, she was teasing her brother-in-law for betting on the Dallas Cowboys, and he chased her. As she was running from him, Mrs. DI noticed that her daughters' bedroom door was shut and the light was off, so she entered the room. Mrs. DI found the appellant lying on the bed with ALI. He was on his side facing the wall and ALI was lying on her back between the appellant and the wall. MJI was sitting against the wall on the bottom corner of the bed, and the boys were playing on the floor. Mrs. DI told the girls to brush their teeth and asked the appellant to leave the room. The appellant refused and kept saying he wanted to finish "the game." Mrs. DI then asked Sergeant DI to get the appellant out of the bedroom. The appellant continued to refuse to leave the bedroom, but was finally persuaded to do so.

Mrs. DI testified that the next morning, MJI, who was "usually very cuddly in the morning," was "acting strange.... She was refusing to do anything, to get dressed, to have any contact with me. She was withdrawn and very agitated." That morning they went to Mrs. DI's mother's residence. Because MJI was acting out of character, Mrs. DI had a feeling something was wrong and asked MJI if she had fun at the Super Bowl party. MJI replied affirmatively and said they played with a balloon. When Mrs. DI asked what else they played, MJI "pulled her pants and panties down." Mrs. DI testified, "I brought her back to me and I pulled her pants back up and I said, 'Are you sure the pants came down? Your panties, too?' And she said 'Yes.' I said, 'What happened?' and she said, 'He blew on my butt.'" When Mrs. DI's mother entered the room, Mrs. DI told her, "[MJI] just told me something that's very upsetting." Mrs. DI asked MJI to "show Grandma the game you and Troy [Hughes] played." MJI replied that she didn't want her grandmother "to see [her]." When her grandmother said she would look away if MJI wanted her to, MJI "backed up and pulled her pants down and pulled them back up." Mrs. DI stated that this response "blew [her] away."

After picking up ALI at school and making one other stop, Mrs. DI took her two girls to the hospital. On the way to the hospital, Mrs. DI told MJI she was going to the hospital for "a regular examination, check-up thing." However, when they arrived, MJI would not talk to the attending physician, Dr. Clinton. Instead, in response to questions, MJI would speak to Mrs. DI and say, "Mommy, you tell him." Dr. Clinton left the room, and MJI then told her mother that the appellant "stuck his finger in her butt" and "it hurt." When Dr. Clinton reentered the room, Mrs. DI told him what MJI said.

Mrs. DI then took MJI and ALI to the police station where they were interviewed by Detective Michael Perry. Mrs. DI observed MJI's interview from another room. MJI told Detective Perry about the "you bet" game, in which the appellant bet her whether she would pull down her pants, and she did. MJI also told the detective that the appellant

"stuck his finger in her butt and that he touched her 'pee-pee' [pubic area]." MJI knew Detective Perry was a policeman and she realized she was in a police station.

That night, MJI entered Mrs. DI's bedroom, said she was too scared to sleep in the dark, and asked if she could stay up. Mrs. DI said she could and MJI asked, "Do you want me to tell you about a game we played?" Mrs. DI replied "Yes," and MJI said they played the "pee-pee, poo-poo game . . . where Troy touched her 'pee-pee' and she pretended to pee," and she "touched his 'pee-pee,' and he 'pretended to pee.'" MJI said the appellant "pee-peed" on her hands and on her leg, on his pants, and in ALI's mouth. MJI said she washed "it" off in the bathroom. Mrs. DI testified that the girls wore matching jumpsuits on the day of the party, but she noticed they were wearing shorts and tee-shirts later that evening.

ALI testified that while in their bedroom, they played the "chicken game" with the appellant. During that game she went under her "pony sleeping bag" and the appellant put his finger on her "pee-pee" and rubbed her ten or eleven times underneath her clothing. She testified they also played the "you bet" game in which the appellant asked her and MJI to "show him under [their] pants." MJI pulled her shorts to the side and "showed what was under there," but ALI refused to do the same.

Detective Michael Perry, Abilene Police Department, interviewed the appellant with Air Force Office of Special Investigations (AFOSI) Special Agent (SA) Barry Schultz present. They advised the appellant of his rights, and he indicated that he understood his rights and would speak to them without a lawyer present. Detective Perry testified that the appellant made an oral statement confirming that he was in the children's bedroom from the first quarter through the end of the Super Bowl game. He stated that they played numerous games, including the "wrestling game." He confirmed that he had blown a "raspberry" on MJI's buttocks area and "had pulled [her] clothing to the side" to do this. The appellant admitted that he touched ALI and MJI's bare vaginas and anuses "several" times under their clothing,

but he stated that it happened "accidentally" during "the wrestling game" when he was lifting the girls up. The appellant stated their vaginal areas were "dry," and when he realized that he touched the girls inappropriately, he changed the game "after a few more touches." Detective Perry stated that the appellant admitted sleeping near ALI, but said he was not certain if anything happened, "but it could have, as he was asleep." When asked if it was possible that bodily fluids would be found in the children's residence, the appellant stated that there could be saliva since he had bitten his tongue. The appellant denied exposing himself to the girls. The appellant told Detective Perry he did not have sexual thoughts about children the ages of MJI and ALI, but he admitted having "sexual thoughts about girls as young as 13- or 14-years-old."

SA Michael Corricelli, AFOSI, testified that he conducted a search for physical evidence. When he asked the appellant if he could explain the presence of possible semen in the room (there was none), the appellant told him that he had been aroused earlier by his wife and by watching the Dallas Cowboys' cheerleaders and that, while wrestling with the children, "he had become unadjusted." SA Corricelli testified that the appellant told him

> [h]e doesn't wear underwear . . . and he had to reach into his jeans and adjust his genitalia. He said at that time he did have . . . pre-cum on his penis and it might have transferred onto his hands. . . . [H]e said he was also touching the girls as they were wrestling and playing games and that it might have transferred at that time. . . . [D]uring the course of the games he was kicked in the groin by one of the children . . . and he said that did force out more of the pre-ejaculate.

## II. HEARSAY STATEMENTS

Mrs. DI allowed MJI to be interviewed by the defense counsel, but MJI was afraid and wouldn't talk to them. The military judge found that MJI had never attended school or preschool, that she was 4-years-old and "would not understand the significance of what would happen if she lied in court." The

military judge noted that MJI's counselor told Mrs. DI that it would cause emotional harm to the child to require her to testify, and Mrs. DI would therefore not allow MJI to testify, "even if required to do so." Mrs. DI stated that MJI was "still having bad dreams. She's too young to handle [testifying]." Accordingly, the military judge found MJI unavailable under MIL.R.EVID. 804(a)(6). The appellant did not contest MJI's unavailability at trial and does not cite it as error on appeal. The appellant does argue that the military judge committed reversible error in admitting the hearsay statements of an unavailable witness (MJI) in violation of the Sixth Amendment.

### A. MJI's Statements at Grandmother's House

The military judge found that, the day after the Super Bowl party, MJI was "withdrawn and very agitated" and acting "out of character"; she refused "to do anything, to get dressed, [or] have any contact with her mother." The military judge concluded that MJI's act of pulling her panties down was nonverbal conduct intended as an assertion, and hence a statement and hearsay. The judge found that this nonverbal conduct and the statements MJI made to her mother at her grandmother's house were admissible as residual hearsay under MIL.R.EVID. 804(b)(5) since there were sufficient indicia of reliability and sufficient guarantees of trustworthiness.

The appellant contends that MJI's nonverbal assertion (pulling her pants down in the presence of her mother and grandmother) was not admissible as residual hearsay because the military judge failed to consider MJI's inability to understand the significance of telling the truth. The appellant also contends that the oral statements MJI made at her grandmother's house are inadmissible, noting the military judge's finding that MJI would not understand the significance of lying at trial.

▆▆▆ An accused's right to confront witnesses under the Sixth Amendment is not absolute. *Maryland v. Craig,* 497 U.S. 836, 844, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Supreme Court has held that hearsay is constitutionally admissible against an accused when a witness is unavailable and the statement sought to be admitted falls within a firmly rooted exception or has "particularized guarantees of trustworthiness." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Residual hearsay, "almost by definition ... not shar[ing] the same tradition of reliability" that supports statements admissible under firmly rooted exceptions, is admissible if the evidence bears adequate indicia of reliability. *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Even if reliability is shown to satisfy Sixth Amendment concerns, the analysis is incomplete until the three components for admissibility under the residual hearsay exception are met. The statement is admissible only when it is (1) offered as evidence of a material fact; (2) more probative on the point for which it is offered than any other evidence reasonably procurable; and (3) its admissibility serves the interests of justice. MIL.R.EVID. 804(b)(5).

▆▆▆ Where the declarant does not testify, the military judge may only consider those circumstances surrounding the making of the statement that render the declarant particularly worthy of belief. *United States v. Ureta,* 44 M.J. 290, 296 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 692, 136 L.Ed.2d 615 (1997). However, "[o]ut-of-court statements made by children regarding sexual abuse arise in a wide variety of circumstances, and we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial." *Wright,* 497 U.S. at 818, 110 S.Ct. 3139. In examining whether there are "particularized guarantees of trustworthiness" surrounding the making of a statement which render a child declarant's statement particularly worthy of belief, the Supreme Court has noted such factors as spontaneity, consistency, terminology unexpected of a child of similar age, motive to fabricate, and the mental state of the declarant. *Wright,* 497 U.S. at 821–22. When these "guarantees" are present, the statement passes muster under the Confrontation Clause of the Sixth Amendment even though the declarant does not testify at trial. *United States v.*

*Cabral*, 47 M.J. 268 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1049, 140 L.Ed.2d 112 (1998). Evidence possessing "particularized guarantees of trustworthiness" relates to whether the child was *"telling the truth at the time the statement was made." Wright*, 497 U.S. at 822 (emphasis added).

Consider the facts at the disposal of the military judge: Four-year-old MJI had never attended school or even preschool; MJI's counselor felt it would cause emotional harm to the child to require her to testify; MJI was having bad dreams; and, MJI was afraid to talk to defense counsel. Based on these facts, the military judge found that MJI "would not understand the significance of what happened if she lied *in court.*" (Emphasis added.) However, unlike Senior Judge Snyder, we do not conclude that the military judge found that MJI did not understand the significance of telling the truth in general, only that, like most four-year-olds, MJI would not understand the significance of testifying truthfully in a judicial proceeding. Indeed, by ruling that MJI's statements were admissible hearsay, "the trial court implicitly found that [MJI] was capable of receiving just impressions of the facts and of relating them truly." *See Wright*, 497 U.S. at 825.

■ The military judge's decision to admit or exclude hearsay evidence is reviewed for abuse of discretion. *United States v. Pollard*, 38 M.J. 41, 49 (C.M.A.1993). When the military judge rules on the admissibility of residual hearsay, that discretion is considerable. *Id.* Evidence which is erroneously admitted under the residual hearsay exception, because of Sixth Amendment ties, is error of constitutional dimension requiring reversal unless it is determined to be harmless beyond a reasonable doubt. *United States v. Alba*, 15 M.J. 573 (A.C.M.R.1983) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

■ We find that the military judge did not abuse her discretion in admitting the hearsay evidence in issue. We agree with Senior Judge Snyder that the military judge should have explored MJI's ability to distinguish truth from falsity in general. The military judge should have made more exten-sive findings of fact and did not. We are convinced, however, based on the surrounding circumstances, that MJI related events truthfully under sufficient indicia of reliability *at the time* she made the proffered hearsay statements (even if she, because of her tender age, lacked the ability to appreciate the moral duty to tell the truth in a courtroom full of strangers). In support of that conclusion we make the following findings: MJI was acting out of character that day; her revelations were spontaneous, without a motive to fabricate, and in response to a non-inquisitorial type of question; the nature and content of her responses were unexpected— Mrs. DI stated she was "blown away" by MJI's verbal ("he blew on my butt") and nonverbal (pulling her pants down) statements; MJI was reluctant to answer in the presence of her grandmother and had to be coaxed to relate what she did at the party; *i.e.*, pull down her pants; the length of time between the incident and the hearsay statements was short (the next day); and her mother believed MJI to be truthful as evidenced by her immediately taking MJI to the police station and the doctor. We find that these events provide sufficient "guarantees of trustworthiness" to render MJI worthy of belief. Article 66(c), UCMJ, 10 U.S.C. § 866; *see Wright*, 497 U.S. at 819–20; *Cabral*, 47 M.J. at 272. The military judge did not abuse her considerable discretion. We reject appellant's argument.

### B. *MJI's Statements at Doctor's Office*

The military judge admitted MJI's statement, made at the hospital, that the appellant "stuck his finger in her butt" and "it hurt." The military judge made the following findings: MJI knew she was at the hospital for a physical; Dr. Clinton introduced himself as a doctor; MJI understood she was at the hospital for the purpose of treatment as demonstrated by her decision to tell her mother an additional fact she had not previously disclosed (that the appellant "stuck his finger in her butt and it hurt"); there was a valid medical reason for the evidence; and MJI perceived some benefit from disclosing the evidence. The appellant asserts that the statements should not be admitted because

they were not made to the doctor; the only information the doctor received came from Mrs. DI.

 MIL.R.EVID. 803(4) provides for a "medical exception" to the hearsay rules. Evidence of statements made for the purpose of medical diagnosis or treatment are admissible if they describe "past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." The statement need not be made to a physician; indeed, statements made to nurses, hospital staff, ambulance personnel, even family members or friends, may qualify for admission so long as they are made for the purpose of diagnosis or treatment. *United States v. Fling*, 40 M.J. 847, 852 (A.F.C.M.R.1994) (citing *United States v. Welch*, 25 M.J. 23, 25 (C.M.A.1987)). When determining whether statements are admissible under the medical treatment exception to the hearsay rule, the trial judge must ensure before the statement is admitted that the declarant made the statement with some awareness that it was pertinent to her treatment and that the statement was actually for purposes of diagnosis or treatment. If the statement does not fit both prongs, it must be excluded. *United States v. Siroky*, 44 M.J. 394, 400 (1996).

 We find that, because of an insufficient foundation, the military judge erred in admitting this evidence. There is no evidence on the record that Mrs. DI explained to MJI why she was seeing the doctor, other than she was going for "a regular examination, check-up thing." Furthermore, there is no indication that MJI perceived that her statements to her mother were pertinent to her treatment. There is insufficient evidence for us to draw the inference that MJI must have known that any statement she made would help in her treatment. MJI's reluctance to speak to the doctor, in contrast to her willingness to talk to Detective Perry (discussed below), supports our conclusion that she did not expect some medical benefit. However, we find that the admission of this evidence was cumulative and duplicates

MJI's statements to Detective Perry. Accordingly, we find any error harmless.

### C. Statements to Detective Perry Witnessed by Mrs. DI

 MJI's statements to Detective Perry that the appellant touched her "pee-pee" and put his finger in her "butt" were admitted through the testimony of MJI's mother as residual hearsay. The appellant contends that the statements lacked circumstantial guarantees of trustworthiness because the only thing MJI knew about police was that they were "nice" and "helpful" and "she would wave at them when she went through the main gate." In admitting the evidence, the military judge did not make specific findings with respect to the admissibility of the statements to Detective Perry; the military judge said only that "the statements ... have the same indicia of reliability" as the statements made to MJI's mother.

While it would have been preferable for the government to introduce MJI's statements to Detective Perry through his testimony rather than Mrs. DI's, we find sufficient indicia of trustworthiness. MJI had no reason to fabricate, and her statement involved a matter beyond the common knowledge of a four-year old; *i.e.*, having someone put a finger in their "butt." The length of time between the incident and MJI's statements to Detective Perry was short; *i.e.*, one day. We also note that Detective Perry testified at trial regarding the appellant's admissions and was, therefore, available to testify for the defense if they desired to challenge the content or veracity of Mrs. DI's testimony concerning MJI's statements. *Cf. United States v. Casteel*, 45 M.J. 379, 382 (1996) (appellant's right to confrontation was not violated where videotaped testimony of child victim was introduced into evidence and defense given the opportunity to cross examine the detective on circumstances surrounding the taking of the statement), *cert. denied*, ___ U.S. ___, 117 S.Ct. 963, 136 L.Ed.2d 848 (1997). We find that the military judge did not abuse her discretion in admitting this evidence.

### D. Pee-pee, Poo-poo Game

The military judge admitted MJI's statement to her mother about the "pee-pee, poo-poo" game as an excited utterance and pursuant to *United States v. Grant*, 42 M.J. 340, 343 (1995). The appellant argues that the statement is not credible as it was contradicted by ALI who testified those events did not take place.

MIL.R.EVID. 803(2) sets forth the excited utterance exception to the hearsay rule. An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." As time lapses between the event and the making of the statement, the more other factors, such as age of the declarant, bear on the issue of reliable spontaneity. *United States v. Grant*, 38 M.J. 684, 691 (A.F.C.M.R.1993), *aff'd*, 42 M.J. 340 (1995). Moreover, "as the age of the declarant decreases, the more elastic the elapsed time factor, within reason." *Id.* at 691 (citing *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)).

We believe MJI was "under the stress of excitement" caused by an "event or condition" when she made the statements to her mother, as evidenced by her inability to go to sleep and her desire to talk to her mother concerning the "pee-pee, poo-poo" game. However, we consider it more likely that the "stress of excitement" was caused by that day's "startling" events, *i.e.*, going to the doctor and the police station, rather than the appellant's acts the previous day. Accordingly, we conclude that this evidence was not admissible as an excited utterance. Additionally, we believe that its probative value was substantially outweighed by its prejudicial impact. However, given the overwhelming state of the evidence against the appellant, we find that admission of this evidence was harmless error as it applies to the findings of guilt. *See United States v. Pruitt*, 43 M.J. 864, 870 (A.F.Ct.Crim.App.1996), *aff'd*, 46 M.J. 148 (1997). Nevertheless, this testimony, which contained uncharged misconduct (according to MJI, the appellant "pee-peed" on her hands and leg, on his pants and

in ALI's mouth) probably prejudiced the members' sentence deliberations. We will remedy that error in our decretal paragraph.

## III. UNCHARGED MISCONDUCT

The appellant next argues that the military judge erred by denying a defense motion to exclude numerous instances of uncharged sexual misconduct. The evidence the military judge admitted includes: Mrs. DI's testimony regarding her knowledge of prior sexual abuse by the appellant, Detective Perry's testimony that the appellant had sexual thoughts about 13– and 14–year–old girls, and Tammy Hughes' testimony that she suspected the appellant of abusing their son.

Evidence of other crimes, acts or wrongs may be admissible to prove "motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident." MIL. R.EVID. 404(b). A three-part test for reviewing admissibility of uncharged misconduct evidence was set forth in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A.1989):

1. Does the evidence reasonably support a finding that the appellant committed the prior acts? *United States v. Mirandes–Gonzalez*, 26 M.J. 411 (C.M.A.1988).

2. What fact of consequence is made more or less probable by the existence of this evidence? MIL.R.EVID. 401; *United States v. Ferguson*, 28 M.J. 104 (C.M.A. 1989).

3. Is the probative value substantially outweighed by the danger of unfair prejudice? MIL.R.EVID. 403.

The relevant evidence need not fit exactly into one of the pigeonholes described under MIL.R.EVID. 404(b) so long as the evidence is offered for a purpose other than to show the accused's predisposition to commit the crime. *United States v. Acton*, 38 M.J. 330, 333 (C.M.A.1993); *United States v. Arevalo*, 43 M.J. 719, 721 (A.F.Ct.Crim. App.1995). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless pre-

sentation of cumulative evidence. MIL. R.EVID. 403. The standard of review is whether the military judge abused her discretion in admitting the evidence. *United States v. Sullivan*, 42 M.J. 360, 363 (1995); *United States v. Spata*, 34 M.J. 284 (C.M.A. 1992). When evidence of uncharged misconduct is erroneously admitted, we must test for prejudice. With error of non-constitutional dimension, we may find an error harmless if either the finder of fact was not influenced by the inadmissible evidence, or it had but a slight effect on the resolution of the case. *United States v. Barnes*, 8 M.J. 115 (C.M.A.1979); *see also Acton*, 38 M.J. 330; *United States v. Franklin*, 35 M.J. 311 (C.M.A.1992).

### A. *Mrs. DI's Testimony*

■ Mrs. DI testified that on two separate occasions, both prior to 28 January 1996, she told the appellant she did not want him to be alone with her daughters. She did this because she had heard allegations against the appellant involving other children in 1992 and 1994. She didn't know if the allegations were true, but the information made her cautious. She also testified that her father had sexually molested her three older sisters. As a result, she "was probably more cautious than someone who hadn't had this in their family." The military judge allowed Mrs. DI to testify that she knew about the prior allegations of abuse concerning the appellant, because her knowledge was relevant to her state of mind when questioning her daughters. The military judge stated that, while she believed the prejudicial impact to be "significant," she had "done a balancing test under 403" and considered "the probative nature" of the testimony to be "very significant."

The appellant contends that no matter how relevant and how proper the admissibility of uncharged misconduct, such evidence is not admissible if the evidence supporting the uncharged misconduct does not reasonably support a finding by the fact-finder that the accused actually committed the prior acts. *Arevalo*, 43 M.J. at 721. The appellant complains that the military judge failed to inquire into the nature of Mrs. DI's knowledge

of these prior allegations of sexual abuse and that these allegations were "unfairly prejudicial because the basis for Mrs. DI's 'knowledge' was virtually nonexistent."

The military judge limited the prejudicial impact of the evidence by instructing the members that they could consider Mrs. DI's testimony regarding the prior allegations of sexual abuse of minors only "for the limited purpose of its tendency, if any, to explain the state of mind of [Mrs. DI] on or about 28 January 1996." The military judge further advised the members to "not consider this evidence for any other purpose," or "conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offenses charged."

■ We find that the probative value of this testimony was substantially outweighed by its prejudice. Knowing Mrs. DI's state of mind when questioning her daughters was not critical to the government's case, whereas the information regarding prior incidents with children was unduly prejudicial, even given the limiting instruction. Having said that, we conclude that this inadmissible evidence had no impact on the members' findings, given the very substantial evidence of guilt regarding the charged offenses—the appellant's own admissions combined with his ludicrous explanations (to be discussed), ALI's testimony, admissible statements given by MJI, corroborating evidence from numerous sources placing the appellant in the children's room, lying next to ALI, etc. Therefore, we find the error in admitting the evidence discussed above harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1994). Nevertheless, we are convinced that this testimony probably contributed to the appellant receiving an inappropriately severe sentence, which we will address in due course.

### B. *Detective Perry's Testimony*

■ Trial defense counsel objected to Detective Perry's testimony that the appellant had sexual thoughts about 13– and 14–year–olds, arguing that "there's a big difference between a teenager and a 5– or 6–year–old" and that this evidence was more prejudicial than probative.

The military judge found that the probative value of the evidence outweighed its prejudicial effect and admitted the testimony citing the government's burden of proving each and every element of the offenses. The judge stated that an accused who admitted "accidentally" touching children in their pubic and anal areas, and having sexual thoughts regarding 13– and 14–year–olds, "certainly provides some probative evidence" regarding his intent in making such touches. She also found the statements served to rebut the appellant's suggestion that the touches were innocent.

The military judge did not abuse her discretion. Since the appellant admitted the "touchings," intent was at issue. The appellant's admissions and incredulous explanations served to rebut his claim that the "touchings" were innocent. We are not surprised that an accused would attempt to minimize the criminality of his actions by admitting to sexual thoughts regarding children somewhat older than his victims, but not the same ages of the victims. What is significant is that the appellant admitted having sexual thoughts regarding underage females. We find this evidence relevant and probative, and we reject this assigned error.

## C. Mrs. Hughes' Statements

An Additional Charge and Specification alleging an indecent act on his 2–year–old son, DH, was referred against the appellant based on information from the appellant's wife. At an Article 39(a), UCMJ, session to determine the admissibility of Mrs. Hughes testimony regarding this matter, the trial defense and government counsel agreed that DH was incapable of taking an oath, and therefore unavailable to testify. The defense, however, stated that they were not waiving their confrontation rights.

Mrs. Hughes testified in the Article 39(a), UCMJ, session that, on 14 February, she took her son DH to the hospital because he was "humping the pillows and everything else . . . ." DH was examined by Dr. Kemper, who determined that her son had been molested based on "tears on his anus muscle." Dr. Kemper told her that the injury could only have occurred as a result of abuse.

DH was present when the doctor told her this. Following that examination, Mrs. Hughes testified that she went directly to the police department and reported the incident to Detective Perry. That evening after giving him a bath, Mrs. Hughes asked DH if anybody hurt him and he said "Yes." She asked him where, and he "pointed to his butt." He touched it "right in the middle." When she said "Who?", DH said "Daddy." Mrs. Hughes stated that she left her husband at the end of January and filed for divorce on 7 February 1996, prior to the meeting with Dr. Kemper.

At the appellant's trial, the military judge granted a defense motion to preclude admission of Mrs. Hughes' statement (that her son told her "Daddy" hurt his "butt"). The military judge determined that the evidence lacked reliability because the child did not tell anyone else about this allegation, the statement could refer to something other than sexual abuse, and Mrs. Hughes was in a child custody fight with the appellant. This ruling resulted in the Additional Charge being withdrawn by the convening authority. The successful exclusion of this information was short lived, however.

During its case-in-chief, the defense called Mrs. Hughes. She initially provided testimony favorable to the defense by indicating she went to the girls' bedroom and checked on her husband "at least six times," and the door to the bedroom was unlocked. Her testimony turned adverse, however, when on cross-examination she stated her husband was a "pretty big fan" of the Dallas Cowboys and that it was "kind of a surprise" that he turned down her offer to watch the children so that he could watch the game. She also testified that she saw the two girls on the bed under a blanket, and the appellant was on his knees next to the bed with his head underneath the same blanket. She stated that on another occasion, she went in the bedroom, the lights were off, the appellant was lying on the bed, and he had his arm around ALI, who was lying in front of him.

On cross-examination the government further elicited that Mrs. Hughes was divorcing the appellant. In an apparent attempt to demonstrate Mrs. Hughes' bias against the

appellant, the defense counsel asked Mrs. Hughes, "In fact, not only are you divorcing your husband, you're also seeking custody of your son, aren't you?" Trial counsel then asked for an Article 39(a), UCMJ, session because he planned to ask Mrs. Hughes why she was divorcing her husband. The defense objected, citing MIL.R.EVID. 403; *i.e.*, the information would be more prejudicial than probative.

The military judge ruled that Mrs. Hughes could state her belief that the appellant had abused their son, but not how she arrived at that belief (her son's statement that "Daddy hurt my butt"). The military judge ruled that the government could ask the question on a number of bases. First, because the defense had "opened the door" by asking about the child custody issue and attempting to impeach their own witness, the government was "entitled to rehabilitate the witness." The military judge found the evidence was "highly probative," the value of which outweighed the associated prejudice. The military judge stated that she believed the evidence was admissible under MIL.R.EVID. 414, in addition to MIL.R.EVID. 608 (evidence of bias). The military judge went on to say, "I believe Congress enacted 414 because they believed courts were being too restrictive in their interpretation of MILITARY RULE OF EVIDENCE 403." The military judge also found the evidence admissible (incorrectly) as a "present sense impression" because Tammy Hughes believed her son had been sexually abused by the accused, in part because she was aware of previous allegations of sexual abuse against the accused.

Mrs. Hughes testified on recross-examination, without objection from the defense, that her best friend had made allegations of abuse against the appellant regarding her 3– or 4– year–old daughter. There were similar allegations from her nephew and niece when she and the appellant previously contested custody of their son. The appellant complains that this uncharged misconduct was unfairly prejudicial and should not have been admitted unless or until a relevant issue was clearly in controversy.

MIL.R.EVID. 414(a) provides that "in a criminal case in which the defendant is ac-

cused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant." A "child" is defined as "a person below the age of 14." MIL.R.EVID. 414(d). The rule is identical to FEDERAL RULE OF EVIDENCE 414, enacted by Congress on 13 September 1994. It became applicable to court-martial use by operation of law (MIL.R.EVID. 1102) on 6 January 1996. During the limited congressional debate on FED.R.EVID. 414 and FED.R.EVID. 413 ("Evidence of Similar Crimes in Sexual Assault Cases"), "Representative Susan Molinari, the Rules' primary sponsor, said it was Congress' specific intention that the courts 'must liberally construe' both rules so that finders of fact can accurately assess a defendant's criminal propensities and probabilities in light of his past conduct." MIL.R.EVID. 414, Editorial Comment.

 A court need not make a finding that the government has proved other act(s) by a preponderance of the evidence before it submits "similar acts" and other Rule 404(b) evidence to the jury. Rather, "similar acts" evidence should be admitted if there is evidence of acts of prior uncharged sexual misconduct sufficient to support a finding by the jury that the defendant committed the similar act. *Huddleston v. United States*, 485 U.S. 681, 689–90, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Finally, failure to object to the testimony of a witness or argument of counsel constitutes waiver in the absence of plain error. *United States v. Dudding*, 37 M.J. 429, 430 (C.M.A.1993).

Having determined the evidence was admissible under MIL.R.EVID. 414 and other bases, the military judge instructed the members that they could consider evidence that Tammy Hughes was seeking custody of her son, DH, because she believed that he was sexually abused by the appellant. She further instructed that they could consider

> testimony by Tammy Hughes that there were prior allegations of sexual abuse made by the three or four year old daughter of Tammy Hughes' best friend and by a niece and nephew of Tammy Hughes for

the limited purpose of its tendency, if any, to rebut the implication of bias arising from the testimony that Tammy Hughes is engaged in a custody battle with the accused involving DH. You may not consider this evidence for any other purpose, and you may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offenses charged.

We will first address the admissibility of Mrs. Hughes' statements that there were prior allegations of sexual abuse made by the daughter of her best friend and by a niece and nephew. Although there was no objection by the defense at this point, we find this information was clearly inadmissible.

■ We recognize that Mil.R.Evid. 414 expands the admissibility of prior acts of child molestation. Indeed, the chief judge of our superior court has noted that, under the rules of evidence now in effect, acts of prior uncharged sexual misconduct are "purportedly admissible per se." *Casteel,* 45 M.J. at 385 (footnote omitted). While we do not pretend to be diviners of Chief Judge Cox's inner thoughts, we choose to place the emphasis on his use of the word "purportedly." We are confident that Mil.R.Evid. 414 does not abrogate rules of relevance and admissibility which have survived the constitutional test of time. Mil.R.Evid. 403 and 404(b) have not been invalidated. In this regard, present case law sets out a reasoned method for determining whether evidence of other crimes, wrongs, or acts should be admitted under Mil.R.Evid. 404(b).

If we determine that evidence of misconduct is offered for a purpose other than to show the accused's predisposition to crime, the uncharged misconduct must meet a three-part test. First, it must reasonably tend to prove that the accused committed the uncharged misconduct. Second, the evidence must make some "fact that is of consequence" to the action more or less probable. Finally, the "probative value" of the evidence must not be substantially outweighed by "the danger of unfair prejudice" or confusion. *Reynolds,* 29 M.J. at 109.

We conclude a similar framework may be used for evidence offered under Mil.R.Evid.

414. In examining the admissibility of Mil. R.Evid. 414 "propensity" evidence, we believe that the evidence must still be relevant; *i.e.,* it must make some fact that is of consequence more or less probable. Mil.R.Evid. 401. Secondly, it must still be otherwise admissible evidence; *i.e.,* not simply rumor or inadmissible hearsay. Mil.R.Evid. 401, 402, 403, 802. Third, we hold that it must still comply with the Mil.R.Evid. 403 balancing test; *i.e.,* its probative value may not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, etc.

■ The military judge plainly erred by not excluding Mrs. Hughes' statements regarding these "other" allegations of abuse (those of her nephew, niece, and friend's child). There was no evidence (only what Mrs. Hughes had heard) to support a finding by members that the appellant had committed "the similar act[s]." Indeed, we fail to see how explaining *why* she was seeking custody rehabilitated Mrs. Hughes as a witness or rebutted the implication of bias because she was involved in a custody battle with the appellant. If anything, it would tend to show that Mrs. Hughes harbored even greater bias against the appellant. Furthermore, the prejudicial impact of that information far outweighed any probative value. Mil.R.Evid. 403. We are convinced that the erroneous admission of the information as evidence did not affect findings, given the overwhelming evidence of guilt, but do find that admitting this information prejudiced the appellant's sentence.

■ We now turn our focus to the admissibility of Mrs. Hughes' statement that she was seeking custody of their son because she believed that he was sexually abused by the appellant. We note that the military judge had earlier excluded that evidence because it lacked reliability—the child did not tell anyone else about the allegation, the statement could refer to something other than sexual abuse, and Mrs. Hughes was in a child custody fight with the appellant.

A military judge is not an alchemist who can magically transform evidence, previously determined to be unreliable, into reliable evi-

dence simply because the defense "opened the door," or because MIL.R.EVID. 414 liberalized the admissibility of certain evidence. Unreliable hearsay is still unreliable and *ergo* inadmissible. Nevertheless, we will continue our analysis.

DH told Mrs. Hughes that his "Daddy hurt [his] butt," and a medical examination of DH's anus demonstrated sexual abuse by someone. This evidence could reasonably be used to prove a fact in issue, *i.e.*, the appellant's *intent* to satisfy his sexual desires, as well as absence of mistake or accident (MIL.R.EVID. 404(b)). However, while the military judge admitted the evidence, for various reasons, including MIL.R.EVID. 414, she specifically instructed the members regarding its limited use. That use, as previously stated, appears questionable; *i.e.*, how does it rebut the "implication of bias?" Arguably, it served to demonstrate the *reason* Mrs. Hughes was biased against the appellant (her belief that appellant had abused their son). In that respect the military judge's limiting instruction was off the mark. The military judge also erroneously admitted the evidence as a "present sense impression." *See* MIL. R.EVID. 803(1).

 The members were instructed that they could only consider the evidence "for the limited purpose of its tendency, if any, to rebut the implication of bias." Accordingly, the probative value of this evidence, as limited by the military judge's instruction, was "substantially outweighed by the danger of unfair prejudice." MIL.R.EVID. 403. The statement may have had significant probative value if used to show the appellant's propensity to sexually abuse children (MIL.R.EVID. 414), intent to sexually gratify his lust, or to demonstrate lack of mistake/accident (MIL.R.EVID. 404(b)). However, this evidence was not admitted for those purposes, and therefore of infinitesimal probative value compared to the atomic bomb-like prejudice which inevitably resulted from the disclosure that Mrs. Hughes believed the appellant had abused their son. While we believe the prejudicial impact of this evidence substantially outweighed its probative value, we also believe that it did not affect the ultimate outcome of the findings, since there was more

than ample evidence, apart from this evidence and that which we have already excluded, to support the appellant's guilt. Again, however, we conclude that the appellant's sentence was adversely affected.

## IV. INEFFECTIVENESS OF COUNSEL

Following admission of Mrs. Hughes' statements, trial defense counsel moved for a mistrial based upon their own ineffectiveness, asserting that admission of Mrs. Hughes' statement had "substantially" changed the status of the case, and that "a jury with information regarding allegations of abuse of [appellant's] son is going to be in a far different position than a jury without that information." The military judge denied the motion, stating there had not been any conduct on the part of the defense which rose to the level of ineffective assistance. The military judge ruled that

[t]he defense made a tactical decision to impeach the witness ... by asking her an additional question.... [T]he defense's decision to ask that question was not an incorrect, improper, or otherwise dilatory decision. I don't think the defense can know in advance how a court is going to rule on 414 necessarily at this point. The defense has already shown adequate familiarity with 414 and its implications in arguing 414 and in other portions of this trial. I do not believe the conduct of the defense in asking the question, "Are you also seeking custody of your son," constitutes ineffective assistance.

Following that ruling, the appellant stated he had lost confidence in his counsel. The military judge then informed the appellant he might have to represent himself without counsel and advised him, among other things, that he could "continue this case either with the counsel that have been detailed or ... do so pro se." The appellant subsequently proclaimed that "with the choices I have left, I've got more confidence in them than I do myself to represent me, so I'll keep them as counsel."

The appellant now argues that his counsel were ineffective in opening the door to highly prejudicial uncharged misconduct and by failing to present exculpatory evidence. The

appellant asserts that his defense counsel's "ineffective line of questioning" resulted in the admission of the statements used to rehabilitate Mrs. DI as to her state of mind when questioning her daughters. In addition, the appellant asserts his defense team should have introduced the results of a penile plethysmography test that stated he was primarily aroused by adult females and to a lesser extent fully developed adolescent females, but not any other age or sex grouping.

 When appellant alleges specific errors of counsel, he must show both deficient performance and subsequent prejudice. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While the court will consider a defense counsel's opinion of his or her trial performance in determining competency, counsel's opinion does not dictate the court's decision on the issue. *See United States v. Simoy*, 46 M.J. 592, 604 (A.F.Ct.Crim.App.1996); *United States v. Thomas*, 43 M.J. 550, 581 (N.M.Ct.Crim.App. 1995) (court rejects military defense counsel's claims they were ineffective at capital sentencing proceeding), *modified*, 46 M.J. 311 (1997). The standard of review is "highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). We do not look at the success of a criminal defense attorney's trial theory, but rather whether counsel made an objectively reasonable choice in strategy from the alternatives available at the time. *United States v. Ingham*, 42 M.J. 218 (1995).

 The first burden an appellant bears in establishing ineffectiveness of counsel is to show that the allegations are true. *United States v. Polk*, 32 M.J. 150, 153 (C.M.A.1991) (quoting *United States v. McGillis*, 27 M.J. 462 (C.M.A.1988) (summary disposition)). If true, then we ask if the level of advocacy fell measurably below the performance ordinarily expected of fallible lawyers. If we find ineffective assistance of counsel, we consider whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *United States v. Tharpe*, 38 M.J. 8, 10–11

(C.M.A.1993). In applying these rules, we conclude the appellant does not get beyond the first test.

 The defense, in calling Mrs. Hughes, apparently sought to rebut Mrs. DI's testimony and demonstrate that Mrs. Hughes was not biased in favor of appellant by asserting a bias against the appellant. Presumably, this would make her testimony for the defense more believable. While this strategy in retrospect seems questionable, the evidence against the appellant was substantial, and calling Mrs. Hughes may have been the only way to bring favorable evidence before the members without subjecting the appellant to even riskier cross-examination. During trial, evidence which counsel intends to exclude is often admitted; that is what occurred here.

 Regarding the plethysmography test, the results were in the form of a letter which stated that the "results" could not be used to validate prior behavior or to predict future behavior, and thus were of questionable evidentiary value. We find no ineffectiveness on the part of trial defense counsel. We reject this assignment of error.

## V. MOTION FOR MISTRIAL

In a related assignment of error, the appellant argues that the military judge erred in denying the motion for mistrial. He complains that his counsel's "blunder" threw his case "into complete disarray."

 A military judge "may as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). A mistrial is a drastic remedy and will be granted only to prevent a manifest injustice against the accused. *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990). The military judge's decision denying a mistrial is reviewed for abuse of discretion. *United States v. Dancy*, 38 M.J. 1, 6 (C.M.A.1993); *Rushatz*, 31 M.J. at 456. The focus is on whether a "curative instruction avoided prejudice" to the accused.

*United States v. Garces,* 32 M.J. 345, 349 (C.M.A.1991).

▇ The counsel's tactics, while unsuccessful, did not result in a manifest injustice to the accused. There was more than sufficient evidence against the appellant to establish his guilt beyond a reasonable doubt, excluding Mrs. Hughes' testimony (as well as other evidence we have found inadmissible) that she believed the appellant had abused their son. The proceedings were fair. We find no abuse of discretion, and we reject this assignment of error.

## VI. STAFF JUDGE ADVOCATE'S RECOMMENDATION (SJAR)

The appellant argues that his case must be remanded for a new SJAR and Action because the Staff Judge Advocate (SJA) failed to address trial defense counsel's post-trial assertion that the military judge erred in failing to grant a mistrial. In response to the SJAR, trial defense counsel wrote that, at trial, the defense

> moved for a mistrial after declaring themselves ineffective for allowing [Mrs. Hughes' testimony that she was seeking custody of their son because she believed appellant had been abusing him] into evidence. The military judge denied this motion. SrA Hughes then requested his counsel be released, however, the judge told him his only option at that point would be to represent himself. The defense asserts the military judge erred in this ruling and should have, at a minimum allowed SrA Hughes to seek other counsel. The defense asserts both of these rulings, in the interest of justice, necessitate ordering a rehearing on findings.

The SJA responded to this matter in his Addendum by advising the convening authority that:

> Defense counsel has asked for a rehearing on the guilty findings. According to defense counsel, the judge committed legal error by allowing Mrs. Hughes, the accused's wife, to testify that she was seeking custody of their son as part of a divorce because she believed that the accused had sexually abused the son. In

my opinion, the judge's ruling admitting the testimony was correct ...

The Addendum did not note the request for a mistrial.

▇ An SJA is required to respond to any allegation of legal error submitted by the defense. *United States v. Green,* 44 M.J. 93, 95 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 371, 136 L.Ed.2d 261 (1996); MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), RULE FOR COURTS-MARTIAL (R.C.M.) 1106(d)(4) "In view of the convening authority's responsibilities, erroneous, inadequate, or misleading staff judge advocate recommendations may prejudice substantial rights of an accused." *United States v. Leininger,* 25 M.J. 746, 748 (A.C.M.R.1987). If the error raises a fair risk of prejudice, the convening authority's action must be invalidated. *United States v. Martinez,* 1 M.J. 280, 281 (C.M.A.1976). "If there is no error in the first instance at trial, we will not find prejudicial error in the failure of the SJA to respond...." *United States v. Welker,* 44 M.J. 85, 89 (1996).

▇ We find no prejudicial error. While the SJAR and Addendum should have referenced the defense's motion for a mistrial and did not, they did note and discuss the actual reason the defense asserted error (which was also the underlying reason for the mistrial motion). If the SJA had referenced the defense requested mistrial, we are absolutely convinced that it would not have led to a different result or affected the convening authority's actions. Accordingly, we reject this assignment of error.

## VII. REQUESTED INSTRUCTION

The appellant next argues that the military judge erred when she refused to give a defense requested instruction of accident/mistake of fact. The defense asserted the accident issue was raised by the appellant's statement to Detective Perry that some of his touchings of ALI and MJI happened "accidentally." The appellant contends that, if the facts are considered in a light most favorable to him, it can be concluded that he did not have the intent to gratify his sexual desires when the touchings occurred, that he was doing a lawful act in a lawful manner,

and therefore, the military judge should have given an accident instruction.

■■■■■ The military judge has substantial discretion in deciding what instructions to give. *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993) (citing *United States v. Smith*, 34 M.J. 200 (C.M.A.1992)); R.C.M. 920(c), Discussion. A military judge has a *sua sponte* duty to give appropriate instructions on affirmative defenses raised by the evidence. *United States v. Tatum*, 36 M.J. 302, 304 (C.M.A.1993). Military judges review proposed instructions to determine if: (1) the evidence adequately raises the issue; (2) the matter will be covered in other instructions; and (3) the proposed instruction accurately reflects the law and the relationship of the law to this case. *United States v. Dubose*, 19 M.J. 877, 879 (A.F.C.M.R.1985). The standard of review is whether the military judge abused her discretion. *Damatta–Olivera*, 37 M.J. at 478. Any doubt regarding whether the evidence raises an affirmative defense which requires an instruction should be resolved in favor of the accused. *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A.1981) (citing *United States v. Staten*, 6 M.J. 275 (C.M.A.1979)). R.C.M. 916(f) defines accident as "[a] death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner. . . ." The defense of accident is not available when the act which caused the injury or event was a negligent act. R.C.M. 916(f), Discussion.

■■■■ The military judge ruled that "the defense of accident as it applies in the law involves the absence of any negligence on the part of the accused even in the incidental touching." If the appellant was negligent in the touching, then the defense of accident does not apply. The military judge stated that, if she instructed the members regarding the defense of accident, they might make the "quantum leap" that the appellant was guilty, since the members could "easily conclude" the defense did not apply. The military judge decided that the issue of whether or not the accused's touchings were intentional was adequately covered by the instruction regarding the elements; i.e., that the "government must prove beyond a reason-

able doubt that the accused *intended* [emphasis added] to gratify his lust or sexual desires." The judge also stated that defense counsel were free to argue that the touchings were accidental. The military judge instructed the members that they

> should also consider that the accused denied touching [MJI] and [ALI] with the intent to gratify his sexual desires, that there were other adults in the house, and that Tammy Hughes entered the room on multiple occasions during the Super Bowl party.

The military judge's instructions on this issue were appropriate and they did not adversely prejudice the appellant. The military judge did not abuse her substantial discretion. We reject this assignment of error.

## VIII. MISIDENTIFICATION OF THE PERPETRATOR

The appellant assigns that the military judge erred by excluding "possible misidentification of the perpetrator" evidence, thereby violating his Sixth Amendment right to present a defense. At trial, the defense sought to introduce evidence that ALI was treated for painful urination and a swollen vagina on 16 December 1995. The appellant complains that the physician who treated ALI, and diagnosed "yeast vaginitis," did not explore the possibility of child abuse. The appellant contends that ALI's complaint of a swollen vagina and painful urination supported the theory that ALI misidentified the perpetrator. The defense also intended to call witnesses to show that ALI complained four years earlier that her father "hurt her butt." They also planned to call a therapist to testify that children may misidentify the actual perpetrator of abuse and confuse a later innocent touching with an earlier inappropriate touching. The appellant contends that this theory went to the heart of the defense case.

■■■■■ An accused has the right to present evidence which is relevant, material, and favorable to the defense. That materiality means the suppressed evidence might have affected the outcome of the trial. *United States v. Valenzuela–Bernal*, 458 U.S. 858,

868, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Our review of a military judge's decision to admit evidence is limited to whether she has abused her discretion. *United States v. Sullivan,* 42 M.J. 360, 363 (1995); *United States v. Dorsey,* 38 M.J. 244, 246 (C.M.A. 1993). In doing so, we will defer to the military judge's findings of fact unless they are clearly erroneous. *United States v. Quigley,* 40 M.J. 64, 66 (C.M.A.1994); *United States v. French,* 38 M.J. 420, 424–5 (C.M.A. 1993). To find an abuse of discretion, we must be convinced that the military judge's decision was clearly untenable and deprived the accused of a substantial right such as to amount to a denial of justice. *United States v. Travers,* 25 M.J. 61, 62 (C.M.A.1987).

█ The military judge found that the Article 39(a), UCMJ, testimony of the defense expert was not that ALI had been sexually abused in December 1995, nor that she had reported sexual abuse in December 1995, but that an inadequately documented emergency room record did not rule out sexual abuse as the cause of ALI's December 1995 symptoms. The military judge found the complaint that her father "hurt her butt" occurred because her father put medicine on her anal area for pin worms four years earlier, and the December 1995 treatment of ALI was not relevant in determining whether ALI was sexually abused in January 1996. There was no evidence that anyone other than the appellant ever sexually abused ALI. The military judge concluded that any probative value of the December 1995 medical record was "clearly outweighed by danger of confusion of the issues."

We consider the appellant's theory nothing more than a "red herring" that could not have affected the outcome of the trial. In addition to ALI's testimony, MJI also asserted (through her mother's testimony) that the appellant committed the "touchings." Furthermore, the appellant admitted the "touchings," but argued they were "accidental." This information was not relevant. We reject this assignment of error.

## IX. PRIOR CONSISTENT STATEMENT

The appellant next argues that the military judge erred in admitting an out-of-court statement as a prior consistent statement. ALI testified, among other things, that the appellant played the "chicken game" with them. That game consisted of her going under her sleeping bag and the appellant rubbing her "pee-pee" with his finger. ALI stated that the appellant touched her "pee-pee" 10 or 11 times "underneath" her clothing and on her skin.

Following ALI's testimony, and after the prosecution rested, the defense called Mrs. DI as a hostile witness. The defense elicited that ALI told Mrs. DI that the appellant "wanted her to stick her hand down his pants but she wouldn't because it was all hairy and it scared her." The defense apparently considered this favorable information since they sought to show that the appellant was not a "hairy" person. On cross-examination, the trial counsel asked Mrs. DI what ALI said about the "chicken game" on 29 January 1996. The defense unsuccessfully objected. Mrs. DI testified that ALI told her that in the "chicken game," if you did what the appellant said, you weren't a chicken, but if you didn't do what he said, you were a chicken and you couldn't play. ALI told her that the appellant "stuck his hand up her shorts and tickled her 'pee-pee' and . . . asked to lick her a million times down there." In response, ALI told the appellant, "no, it was nasty." Insisting the statement was hearsay and that no inconsistency had been implied by the defense, the defense unsuccessfully objected. The judge admitted Mrs. DI's testimony as prior consistent statements, and did not conduct a balancing test under MIL.R.EVID. 403.

The appellant asserts this testimony was improper for two reasons: (1) the statement ALI made to Mrs. DI was not made before improper influence (repeated questioning by Mrs. DI at the grandmother's house) occurred; *i.e.,* Mrs. DI's questioning techniques influenced the statements of the girls; and (2) the defense counsel only revealed an inconsistency as to ALI's statement that the appellant asked her to reach into his pants, but she refused because it was "hairy." The defense never demonstrated nor implied that ALI had provided false information about the "chicken game." The appellant argues that the trial defense counsel merely asked ALI

about the nature of the game, and that Mrs. DI should not have been permitted to state what ALI told her about the "chicken game."

■ Our review of a military judge's decision to admit evidence is limited to whether she has abused her discretion. *Sullivan,* 42 M.J. at 363. To find an abuse of discretion, we must be convinced that the military judge's decision was clearly untenable and deprived the accused of a substantial right such as to amount to a denial of justice. *Travers,* 25 M.J. at 62. Prior consistent statements may be admitted for their truth, but only if statements were made prior to the alleged improper influence or improper motive to fabricate arose. A statement is not hearsay if the declarant testifies at trial, is subject to cross-examination concerning the statement, and the statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. MIL.R.EVID. 801(d)(1)(B).

■ One of the appellant's strategies in this case was to suggest improper influence by Mrs. DI on ALI, as evidenced by his questioning of ALI and Mrs. DI. This "opened the door" to evidence demonstrating that ALI's testimony was consistent throughout. Mrs. DI's testimony regarding ALI's statements about the "chicken game" corroborated ALI's testimony that the appellant touched her "pee-pee." While Mrs. DI's response also included the appellant's request "to lick" ALI, we find no prejudice. The statement was consistent with the declarant's (ALI's) overall testimony and served to dispel any inference that ALI was improperly influenced or untruthful. We reject this assignment of error.

## X. CHALLENGE FOR CAUSE

During *voir dire,* Major V revealed that, in 1988, his 39–year–old sister told him that a friend of the family fondled her when she was 9– or 10–years–old. She told him this when he was assigned to the Netherlands because the family friend was living in the Netherlands, and she believed Major V and his family would visit the man without this information. Major V stated that he was "very close" to his sister. When asked if his sister's experience would affect his ability to be fair and impartial, Major V answered:

It's hard to say. I would evaluate the evidence. I think I have the same feelings that maybe a lot of people have ... as far as the devastating effects of sexual abuse. I know it's had some negative implications on my sister, but I think it was stated earlier in the court that we should separate those two ... and just look at the evidence.

Major V went on to state that his sister "had to get some help, some counseling because of it." However, his sister told him that she has forgiven the man and tried to "reach out to him before he died." Major V stated his sister had "worked through it pretty well." He said he could give the appellant a fair trial and that "the most important thing here is a fair and impartial trial for all the parties." Major V agreed that he could consider any, all, or no punishment in this case.

The defense counsel challenged Major V for cause, arguing that the incident had "a great effect" on the sister, that Major V was "very close to her," and therefore it was "simply unfair to have somebody with that background and with that knowledge sitting in judgment of Senior Airman Hughes...." The military judge denied the challenge which, we find, was made on the basis of implied bias. The military judge stated that she "had the opportunity to observe Major [V] throughout all of the *voir dire,* not just at individual *voir dire.*" The military judge noted that Major V affirmed that parents' moods and emotions can affect children and agreed that children can exaggerate and misinterpret things. The military judge stated that she did not believe Major V's, "It's hard to say," response represented a predisposition, but rather represented a desire for clarification; *i.e.,* "could he disregard everything that he knew about his sister or could he decide this case based solely on the evidence." The military judge noted that, "Major [V] was clearly exercising cautious and deliberate decision making. He weighed each question carefully and, I believe was frank and honest with this court." The military judge concluded, "I believe his represen-

tation that he can be fair and impartial, that he can decide this case based solely on the evidence in this courtroom."

▮▮▮▮ An actual bias exists when the member has a personal belief or attitude that will not yield to the evidence and the judge's instructions on the law. Generally, the military judge is in the best position to determine actual court-member bias as that question "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Implied bias is reviewed under an objective standard. *United States v. Dinatale*, 44 M.J. 325 (1996). An implied bias exists when the member's continued presence would cast substantial doubt on the "legality, fairness, and impartiality" of the trial. *See* R.C.M. 912(f)(1)(N); *United States v. Moyar*, 24 M.J. 635 (A.C.M.R.1987). Implied bias is not viewed through the eyes of the military judge or the court members, but through the eyes of the public. *United States v. Daulton*, 45 M.J. 212 (1996). When an issue of implied bias arises, the military judge must focus on the system's appearance of fairness and not just the court-member's disclaimer of bias—military trials must not only be fair, but also appear to be fair, particularly when the government selects the court members. *See United States v. Lake*, 36 M.J. 317 (C.M.A.1993); *United States v. Abdelkader*, 34 M.J. 605 (A.F.C.M.R.1992). Thus, the military judge should grant a challenge for cause if necessary to preserve the appearance of fairness in the trial, even if the judge believes the challenged member will be impartial. *United States v. Swagger*, 16 M.J. 759 (A.C.M.R.1983).

▮▮▮▮ On appeal, we grant the military judge's rulings on challenges great deference. We will not reverse absent a clear abuse of discretion in applying the liberal-grant mandate. *See Dinatale; see also United States v. Hamilton*, 41 M.J. 22, 25 (C.M.A.1994). An abuse of discretion involves more than a difference of opinion. To grant relief, we must find that the decision was "arbitrary," "clearly unreasonable," or "clearly erroneous." *Travers*, 25 M.J. at 62. Implied bias issues are reviewed under a somewhat deferential, more exacting standard. *United States v. Minyard*, 46 M.J. 229 (1997).

▮▮▮▮ We find that the military judge carefully considered Major V's ability to sit as a fair and impartial court-member and found him qualified. There was no appearance of unfairness in Major V serving as a court-member. *See Daulton.* An individual is not disqualified from serving as a court-member solely because the individual, or a family member, has been the victim of a crime similar to the one charged against the accused. *United States v. Brown*, 34 M.J. 105 (C.M.A.1992). We find no implied bias and reject this assignment of error.

## XI. EX POST FACTO

▮▮▮▮ The appellant lastly argues that the changes to Article 57 and the addition of Article 58b, 10 U.S.C.A. §§ 857, 858b, UCMJ, violate the *Ex Post Facto* Clause of the Constitution as applied to him. We note at the outset that the members adjudged total forfeitures. Accordingly, the appellant was not affected, adversely or otherwise, by Article 58b, UCMJ.

The offenses for which the appellant was convicted occurred on 28 January 1996. On 1 April 1996, the changes to Article 57 and the addition of Article 58b became effective. Trial occurred on 28 May 1996. The appellant contends that when his offenses occurred, adjudged forfeiture and loss of grade was not effective until convening authority action under Article 57 (24 September 1996). But, by the time of his trial, the changes to Article 57(a) made forfeiture and loss of grade effective 14 days after the sentence was adjudged (15 June 1996). The appellant complains that his punishment was thereby increased because, under Article 57, he was reduced in rank and suffered total forfeitures of pay approximately 100 days earlier than he would have prior to 1 April 1996.

Appellant's *ex post facto* arguments were resolved by the United States Court of Appeals for the Armed Forces in *United States v. Gorski*, 47 M.J. 370 (1997). In *Gorski*, the Court decided that, while application of the 14-day provisions of Article 57(a)(1) violate the *Ex Post Facto* Clause, the appropriate

remedy does not affect the findings or sentence imposed. Rather, the remedy will extend only to recoupment of forfeitures taken in reliance on the provisions of Article 57(a)(1). Accordingly, collection of any forfeitures or execution of a reduction in rank prior to the date of the convening authority's action is without legal effect. Any such forfeitures already collected from appellant will be restored at the appropriate pay grade. The record of trial is returned to The Judge Advocate General for appropriate action. The case need not be returned to this Court following administrative correction unless further appellate review is required.

## XII. SENTENCE REASSESSMENT

■ Our rulings herein require us to reassess the appellant's sentence. Before we may reassess the sentence, we must first determine what sentence the court-martial would have imposed had prejudicial error not been committed; that is, if Mrs. DI's testimony regarding the "pee-pee, poo-poo" game, her knowledge of incidents of prior sexual abuse by the appellant, and Tammy Hughes' testimony that she suspected the appellant of abusing their son, and her testimony of prior allegations of sexual abuse against other children, were not admitted into evidence at trial. *United States v. Sales,* 22 M.J. 305 (C.M.A.1986). No higher sentence may be affirmed by our Court than would have been adjudged at trial. *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990). We are satisfied that we can make this determination.

The appellant committed indecent acts on two very minor children, in a home into which he had been invited by a fellow military member. While the appellant's offenses perpetrated against these very young victims are extremely serious, we believe that the military judge's erroneous rulings discussed above, while harmless as to findings, had a substantial prejudicial impact on sentence determination. Accordingly, excluding the prejudicial matters that were allowed into evidence, we are confident that the appellant would have received a punishment of no less than a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to the grade of E–1.

## XIII. CONCLUSION

The findings and the sentence, as reassessed, are correct in law and fact, and are

AFFIRMED.

Judge SENANDER concurs.

SNYDER, Senior Judge (Concurring in part and concurring in the result):

I concur only with Parts I, II–B and D, III–B, XI, XII, and XIII of the majority opinion. Otherwise, I concur only in the result, and I provide my bases for why I believe the findings and the sentence, as reassessed, should be affirmed. The majority opinion disposes of two critical issues which are issues of first impression in the Air Force. In the residual hearsay area, the majority opinion, *sub silentio,* expands the law to allow the admission of a hearsay declaration by an unavailable child witness found incompetent to testify truthfully. Further, we struggle to replace the legislature's silence with rational guidance on how MIL. R.EVID. 414 will be applied. Because of what I view as critical uncertainty in certain parts of the majority opinion on this issue, and how it may impact issues of constitutional magnitude, I choose to set forth my reasoning separately.

Before beginning my detailed analysis, I must state a general observation. One of the main premises of the majority opinion is that the military judge did not abuse her discretion by admitting the hearsay statements of MJI. Nonetheless, the majority opinion finds it necessary to find additional facts pursuant to Article 66(c), UCMJ, to support its erroneous conclusion that MJI's hearsay statements contain the necessary indicia of reliability. The majority opinion apparently forgets that, once we exercise our Article 66(c), UCMJ, power with regard to the facts, we no longer are applying an abuse of discretion standard of review. The majority has, unwittingly, crossed the border into *de novo* territory. This is fine, but it would be better if the correct result ensued from the incursion.

## I. RESIDUAL HEARSAY STATEMENTS OF MJI

### A. Statements to Mother and Grandmother

I concur with the majority's conclusion that MJI's out-of-court declarations made to her mother that evening after having experienced a medical examination and a police interview were not excited utterances under MIL.R.EVID. 803(2). There were just too many intervening events to reliably conclude that MJI was acting under the stress and excitement of the events of the night before. I agree, fully, with the majority that it is more likely MJI was stimulated by the events of the medical examination and police interview. The majority does not address the admissibility of these hearsay declarations under MIL.R.EVID. 804(b)(5), although the prosecution included it as an alternative basis for admissibility. Nonetheless, I do not believe these declarations qualify for admission under the residual hearsay rule.

While MJI spontaneously related information which she had not mentioned earlier in the day, we still must factor in all of the questioning she had undergone earlier in the day, as well as the issue of her incompetency, which I discuss *infra*. Therefore, these declarations should not have been admitted. *Cf. United States v. Grant*, 42 M.J. 340 (1995). Unfortunately, I cannot agree with the majority on the admissibility of the other hearsay declarations by MJI.

I am troubled by the failure of the majority opinion to specifically put the law applicable to the Confrontation Clause and the residual hearsay rule to the actual test of the facts of this case. My principal disagreement with the majority opinion is its analytical model for finding some of MJI's out-of-court declarations admissible under the MIL. R.EVID. 804(b)(5) residual hearsay exception.

I am deeply concerned that appellant's Sixth Amendment right to confrontation has been invoked as an incantation but not actually enforced. On the legal grid that is hearsay in criminal law, the right of confrontation is the goal line which must be crossed to score the touchdown of admissibility. Indicia of reliability or circumstantial guarantees of trustworthiness is the defense which the proffered hearsay declaration must defeat to score.

With regard to the issues of hearsay and the right of confrontation, one principle is steadfast: The Sixth Amendment dictates that hearsay declarations which do not qualify as a firmly rooted exception are *presumptively unreliable and inadmissible*. *Idaho v. Wright*, 497 U.S. 805, 818, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This means that we must test for whether the evidence of record *establishes* that MJI was capable of receiving just impressions of fact and relating them truthfully, and that the circumstances surrounding her hearsay declarations provide the necessary indicia of reliability. I believe this record falls short of doing so.

Notwithstanding compelling evidence to the contrary, the majority opinion concludes that the military judge did not find MJI incapable of telling the truth in general, but "like most four year olds, MJI would not understand the significance of testifying truthfully in a judicial proceeding." The majority then proceeds to compound its erroneous conclusion by erroneously applying opposite language in *Wright* to highly adverse facts. Specifically, "[i]ndeed, by ruling that MJI's statements were admissible hearsay, 'the trial court implicitly found that [MJI] was capable of receiving just impressions of the facts and of relating them truly.'" (Citation omitted.) In *Wright*, however, the Supreme Court was not faced with a finding by the trial court that the witness was in fact incompetent to testify truthfully as is the case with MJI. The majority opinion is one of the most profound examples of refusing to yield to overwhelming facts that I've witnessed in my 27 years' experience. Is there really a difference between an inability to testify truthfully in a judicial proceeding and the inability to tell the truth in general?

The simple fact of the matter is that the military judge declared MJI incompetent to testify. In fact, I view the evidence sufficiently compelling to warrant a finding of incompetency by this Court under Article 66(c), UCMJ, even if the military judge had not done so, albeit unconsciously. During

the hearing on trial defense counsel's motion to exclude MJI's hearsay statements, Mrs. DJI was asked if MJI could "understand that she had to tell the truth" and "would she understand what can happen if she lied?" Mrs. DJI answered, "No," to both questions. The military judge, as part of her essential findings, found: "[MJI] has never attended preschool or school. She is four years old and *would not understand the significance of what would happen if she lied in court.*" (Emphasis added.)

Even though the military judge jumbled this finding with her finding that MJI would not respond to questions from either counsel and that a counsellor believed testifying would be traumatic to her, we nonetheless have a finding of fact by the military judge, fully supported by the record, that MJI could not distinguish between truth and falsity. This finding has a far more profound impact than a finding that MJI merely was not capable of communicating in a courtroom setting, an area I explore further, *infra.* MIL.R.EVID. 603 reads as follows:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.

Although MIL.R.EVID. 601 greatly relaxed the rules of witness competency by declaring everyone competent to testify unless expressly excepted, MIL.R.EVID. 603 is a crystal clear exception to MIL.R.EVID. 601's rule of universal competency. Even with a child witness of tender years, the military judge must determine if a child can testify truthfully as required by MIL.R.EVID. 603 before allowing even a willing child witness to testify. *United States v. Morgan,* 31 M.J. 43, 46–48 (C.M.A.1990), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1047 (1991); *United States v. Allen,* 13 M.J. 597 (A.F.C.M.R. 1982). The military judge explicitly ruled that MJI did not meet the requirement of MIL.R.EVID. 603. Yet, paradoxically, the majority opinion concludes that an out-of-court hearsay declaration by MJI is admissible when she would not have been allowed to testify even if produced by her mother. I

am unaware of any military or civilian precedent which supports this conclusion, except perhaps with a firmly rooted exception to the hearsay rule. *See, e.g., State v. Deanes,* 323 N.C. 508, 374 S.E.2d 249, 259 (1988). Available precedents do, however, support the opposite conclusion.

The majority opinion, in my view, takes the wrong path at the fork because it ignores the distinction between incompetency to testify due to an inability to communicate in the courtroom setting and incompetency due to the inability to distinguish truth from falsity. The latter is critical and is an integral part of assessing the indicia of reliability of hearsay declarations of child witnesses. The Supreme Court spoke specifically to this issue in *Wright* when the Court observed that the Idaho trial court did not declare the child witness incompetent, but merely that she was unable to communicate to the jury, stating as follows:

> [T]he more reasonable inference is that, by ruling that the statements were admissible under Idaho's residual hearsay exception, the trial court *implicitly* found that the younger daughter, *at the time she made the statements, was capable of receiving just impressions of the facts and of relating them truly.*

*Wright,* 497 U.S. at 824–25 (emphasis added). As I alluded to, *ante,* the Court's inference was drawn because of an absence of evidence to the contrary. With MJI, there is clear, unrebutted testimony from her mother that she could not distinguish truth from falsity— in any setting! This testimony sets the boundaries, period. Any finding contrary to this testimony is erroneous. The Supreme Court's language really only highlighted the necessity of clearly distinguishing the two types of incompetency. As a result, the federal courts have been diligent to make this critical distinction.

In *Swan v. Peterson,* 6 F.3d 1373 (9th Cir.1993), the Court framed the issue as follows:

> The Swans do not contest the trial court's determination that the children were incompetent to testify and "unavailable" for hearsay purposes. The crux of this appeal is whether the incriminating statements

bore sufficient "indicia of reliability" to withstand scrutiny under the [confrontation] clause. . . . *The trial court recognized the distinction between R.T.'s ability to testify in a courtroom setting and to tell the truth at the time of the declarations. It clearly considered her incompetent only as to the former.* We defer to its finding.

*Id.* at 1379, 1382 (emphasis added).

In *Government of Virgin Islands v. Riley,* 754 F.Supp. 61 (D.Vi.1991), the issue before the Court was whether the child witness was sufficiently unavailable for the child's deposition to be admissible under FED.R.EVID. 804(b)(5). In actuality, this particular decision was *Riley II.* In *Riley I,* the trial judge authorized a video taped deposition after declaring the child incompetent to testify in open court, stating as follows:

*I am confident that the child is capable of receiving just impressions of fact and of relating them truly* [citation omitted], *but I am equally certain that the child may be unable to communicate to the jury at trial, either because of generalized courtroom trauma, nervousness or excitement.*

*Government of Virgin Islands v. Riley,* 750 F.Supp. 727, 729 (D.Vi.1990) (emphasis added).

A brief look at *Gregory v. North Carolina,* 900 F.2d 705 (4th Cir.1990), also is illustrative, wherein the Court viewed its task as follows:

No doubt because of the relative novelty of the [*Ohio v. Roberts*] exception and the fact-specific examination each *Roberts* inquiry demands, the cases, rather than publishing a comprehensive list of possible corroborating factors, tend to consider *what, in the declarant's condition or otherwise, suggests truthfulness or a lack thereof.*

*Id.* at 707 (emphasis added).

Our own superior court also has indicated that competency to testify truthfully is an integral part of determining admissibility of hearsay declarations under the residual hearsay rule. While reviewing the admissibility of an out-of-court interview of a non-communicative 4–year–old witness who appeared at trial, the Court stated as follows before setting forth the child's in-court testimony:

On direct examination of AG, *after establishing her ability to distinguish between truth and falsehood and her understanding of the need to testify truthfully. . . .*

*United States v. Casteel,* 45 M.J. 379, 381 (1996) (emphasis added).

All these cases stand for the fact that there is an immense substantive difference between a trial judge determining a witness, who is otherwise competent, is incapable of testifying in a courtroom setting and determining a witness is unable to distinguish truth from falsity, because the latter impacts whether the witness' testimony will even be heard. This leads to the inescapable conclusion that, where the latter is present, that fact must be an integral part of any assessment of whether an out-of-court declaration by such an incompetent witness possesses sufficient indicia of reliability for confrontation purposes.

If MJI, due to tender years and insufficient maturity, rather than a subsequent intervening physical disability, was incapable of distinguishing truth from falsity at the time of trial, she surely was incompetent to do so at an earlier time. Therefore, any out-of-court declaration by MJI must be assessed for indicia of reliability in light of the fact that she was incompetent to testify truthfully both at the time of trial and when she made the out-of-court declarations in question. *See, e.g., United States v. White,* 17 M.J. 953, 954–60 (A.F.C.M.R.1984). The factors used by the majority to find indicia of reliability are inconsequential without an assessment of her incompetency.

Accordingly, it is imperative that military judges clearly distinguish between the two and where, as in the instant case, we have an inability to testify truthfully, the surrounding circumstances of a hearsay declaration must be especially scrutinized to satisfy the Sixth Amendment requirement of sufficient indicia of reliability. *Swan,* 6 F.3d at 1379, 1382; *Gregory,* 900 F.2d at 707; *Riley,* 750 F.Supp. at 729; *see also Doe v. United States,* 976 F.2d 1071 (7th Cir.1992). If a child witness merely is incapable of testifying in open court, the critical factors considered and

weighed to determine if an out-of-court declaration by an incompetent child witness possesses indicia of reliability appear to be spontaneity, whether there is a motive to fabricate, and the presence or absence, or both, of age-appropriate terminology. These, of course, are some of the *Wright* factors. *Wright*, 497 U.S. at 822–23. In light of Mrs. DI's testimony that MJI didn't understand truthfulness, what caused her to conclude that MJI should be believed when she pulled down her panties and made the statements in question? The majority approaches it from the opposite direction: since Mrs. DI reacted by taking MJI to the doctor and reporting the incident, etc., she obviously viewed MJI as truthful; *voila*, MJI is truthful and reliable.

The true state of the record in the instant case, however, is that we have no assessment whatsoever of MJI's ability to perceive and communicate events. The reason for this is that this area was completely ignored at trial, a factor which should enure to appellant's benefit. The majority opinion remedies this deficit merely by concluding it away instead of testing for supporting facts.

Under normal circumstances, I would be disposed to find MJI's spontaneous, non-verbal, hearsay declaration of pulling down her panties sufficiently reliable to satisfy appellant's right of confrontation and admit the evidence under MIL.R.EVID. 804(b)(5). *See United States v. Grant*, 42 M.J. at 343. Unfortunately, as I note above, there is no evidence in the record to demonstrate that MJI was capable of understanding and replying truthfully to her mother's question of what games did she play with appellant, as well as the other questions asked her. This probably is because the parties at trial did not appreciate the significance of the military judge declaring MJI incompetent to distinguish truth from falsity. There simply is no evidence in the record to comply with *Wright's* requirement that the surrounding circumstances demonstrate that MJI could receive just impressions and relate them truly. Therefore, I believe the majority is in error in holding that she could, and I believe this non-verbal hearsay declaration is inadmissible.

Obviously, I reach the same conclusion with regard to MJI's other hearsay declarations made in the presence of her grandmother and Mrs. DJI. In justifying its conclusion to the contrary, the majority apparently forgets or ignores the Supreme Court's adjuration in *Wright* that a true statement is not necessarily a reliable statement. *Wright*, 497 U.S. at 822. The circumstances surrounding the making of the hearsay statement must demonstrate that it is reliable as well as true. Given MJI's incompetency, and the dearth of other illuminating evidence, I cannot so conclude.

MJI's hearsay statement that "he blew on my butt" was not spontaneous. It was in response to Mrs. DJI's question after MJI pulled down her panties. In making her findings, the military judge made no mention whatsoever of MJI's inability to testify truthfully, nor did she make a specific finding that MJI exhibited the ability to accurately perceive and relate events at the time she made the statement. Further, neither counsel nor the military judge inquired of Mrs. DJI what the term "butt" meant to MJI or if it had any meaning at all. It's an elementary term to adults of average intelligence, but what did it mean to MJI, a child who cannot distinguish truth from falsity? Was it part of her daily vocabulary, or was it a term she would have heard someone else use? Here the record is deafly silent. The absence of this evidence is not merely a matter of what weight the factfinder might attach to MJI's statement. It actually goes to the heart of testing for indicia of reliability and, hence, admissibility.

### B. Statements To Detective Perry

With regard to MJI's statements made to Detective Perry, the majority strays even further afield. But then, again, the record does not provide much assistance, which means the statements should not be considered. Remember, per *Wright*, we begin with an assumption of unreliability and inadmissibility.

The majority misreads the record by saying defense counsel had the opportunity to call Detective Perry to testify. First, upon timely objection—which we have in the in-

stant case—it is the prosecution's burden to produce evidence which establishes the admissibility of hearsay evidence. In the instant case, there was no evidence presented and heard on the circumstances surrounding Detective Perry's interview of MJI, other than Mrs. DI's testimony regarding MJI's view of policemen. This hardly is sufficient. Further, when defense counsel reminded the military judge that the defense also objected to the hearsay statements made to Detective Perry, the military judge merely stated that her findings regarding MJI's statements to Mrs. DI and her mother applied equally to Detective Perry's interview and the objection was therefore overruled.

This manner of assessing the admissibility of hearsay under the residual rules is interesting to say the least. It flies directly in the face of long-standing precedents regarding out-of-court statements made during police interviews. Although not *per se* unreliable, they must be construed thoroughly prior to admitting them. *United States v. Cabral*, 47 M.J. 268, 271 (1997) (and cases cited therein). This required scrutiny is totally absent from the instant case. The majority's reliance on *Casteel* is misplaced. First, in *Casteel*, the witness was competent and was produced and testified in court, albeit briefly and incompletely. *Casteel*, 45 M.J. at 381. Second, the issue in the instant case is not Mrs. DI's veracity, but the absence of testimony regarding the circumstances surrounding the interview, of which there was an abundance in *Casteel. Id.* at 382–83.

There also is the fact that, by the time MJI was interviewed by Detective Perry, she had been questioned by her mother and examined and questioned by a physician. Further, as mentioned, we have no evidence as to MJI's daily vocabulary, etc. *See Wright,* 497 U.S. at 826–27. But we do have the fact of her incompetency. MJI was not able to affirm the truthfulness of what she told Detective Perry. Whether the interview was under oath is an important factor when assessing police interviews. *Cabral,* 47 M.J. at 272. Therefore, I have difficulty with the military judge lumping an entirely separate interview, with a police officer no less, in with MJI's initial declaration. Further, I deem

the record woefully inadequate for me to find the necessary indicia of reliability using our factfinding power under Article 66(c), UCMJ.

## II. MIL.R.EVID. 414

Before all is said and done, this rule probably will supplant MIL.R.EVID. 404(b) as the most litigated rule. I agree almost entirely with the majority's final result, but I write separately to state what I believe to be the holding of this decision with regard to how MIL.R.EVID. 414 will be applied in the Air Force pending a decision from our superior court. Because I am not at all certain that this rule is as expansive as the majority opinion states (but yet applies restrictively— properly I might add), I also set forth my analysis.

### A. Admissibility

First, I address the admissibility of Mrs. Hughes' statements that there were prior allegations of sexual abuse made by the daughter of her best friend and by a niece and nephew. My first determination is the standard of review. Trial defense counsel did not interpose further objection when Mrs. Hughes' testimony extended to allegations regarding her best friend's child. While failure to object usually results in waiver absent plain error, MIL.R.EVID. 103(a)(1) and (d), I believe counsel sufficiently objected to preserve the matter for review. Prior to Mrs. Hughes' testimony, there had been an extensive Article 39(a), UCMJ, session where trial defense counsel vigorously objected to testimony involving other acts or offenses, even to the extent of requesting a mistrial on the grounds of ineffective assistance of counsel. Therefore, I find that the defense had more than indicated their objection to this line of questioning. Accordingly, I will review the military judge's ruling allowing the testimony for an abuse of discretion vice plain error. *United States v. Spata,* 34 M.J. 284 (C.M.A.1992).

MIL.R.EVID. 414 provides, in part, as follows:

(a) In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be

considered for its bearing on any matter to which it is relevant.

. . .

(c) This rule shall not be construed to limit the admission or consideration of evidence under any other rule.

(d) '[C]hild' means a person below the age of 14. . . .

Neither trial nor appellate defense counsel attack the constitutionality of the rule. Therefore, I do not address that issue.

The genesis of this rule is the *Violent Crime and Control and Law Enforcement Act of 1994*, Pub.L. 103–322 (1994), which amended the FEDERAL RULES OF EVIDENCE by adding Rule 414. Pursuant to MIL. R.EVID. 1102, the MILITARY RULES OF EVIDENCE were amended by operation of law effective 180 days later (6 January 1996). Although the language of the rule is straightforward, how the rule fits into the overall design and concept of the MILITARY RULES OF EVIDENCE and the limitation on its reach, if any, is hardly straightforward. To the extent that the new rule has attracted the attention of commentators, significant attention has been devoted to concern that the rule has no limits with regard to admissibility and use, and they search the limited legislative history as a source of such limitation. *See, e.g.,* MILITARY RULES OF EVIDENCE MANUAL, 3d ed., 161 (1996 Supp.); Major Stephen R. Henley, *Caveat Criminale: The Impact of the New Military Rules of Evidence in Sexual Offense And Child Molestation Cases*, DE-PARTMENT OF THE ARMY PAMPHLET 27–50–280, 88–89 (Mar.1996); Mark A. Sheft, *Federal Rule of Evidence 413: A Dangerous New Frontier*, AMERICAN CRIMINAL LAW REVIEW, 67–68 (Fall 1995).

Unlike the majority, however, I believe we must forgo the legislative history and deal solely with the terms of MIL.R.EVID. 414 because of its straightforward language, at least with regard to subsections (a) and (d). In the absence of ambiguity, and the absence of a clear, unambiguous expressed legislative intent to the contrary, the judiciary does not look beyond the terms of the statute itself. *United States v. Guess*, 48 M.J. 69 (1998); *United States v. Desha*, 23 M.J. 66, 68 (C.M.A.1986) (quoting *Consumer Product*

*Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808, n. 3, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989).

Considering how the new rule fits into the whole that is the MILITARY RULES OF EVIDENCE, I first note that it is part of Section IV, *Relevancy and Its Limits*, from which I infer, in the absence of a contrary intent specifically expressed in the terms of the rule, that Congress intended MIL.R.EVID. 414 to work in consonance with the other rules contained in Section IV. Congress' mandatory language, "is admissible," standing alone, appears to satisfy MIL.R.EVID. 401 and 402, which define relevancy and allow admission of all relevant evidence respectively. A dictum of our superior court's chief judge makes a similar observation: "in any trial under the rules of evidence now in effect, such prior acts are *purportedly* admissible per se." *Casteel*, 45 M.J. at 385 (Cox, C.J.) (emphasis added). Unlike the commentators, however, I do not read MIL.R.EVID. 414 as requiring the quantum leap in logic to unlimited admissibility and unfettered application, because MIL.R.EVID. 414 also states that the admissibility of such evidence is "on any matter to which it is relevant." Accordingly, evidence of other acts of child molestation must still survive a relevancy determination in order to be admissible, although Congress clearly intended that the scales start out tipped in favor of relevancy. Further, in my view, Congress' clear statement of admissibility means that the prosecution need not await the rebuttal stage to seek introduction of such evidence, as is currently the case for evidence offered under MIL.R.EVID. 404(b). *United States v. Franklin*, 35 M.J. 311 (C.M.A.1992). This is consistent with where Congress inserted MIL.R.EVID. 414. There remains, however, the question of the interoperability of the rule with the remaining rules of Section IV.

The only language within MIL.R.EVID. 414 which specifically refers to the other rules is subsection (c). Interestingly, the MILITARY RULES OF EVIDENCE MANUAL opines that, "This rule is an exception to Rule 404(b). Here trial counsel can use a prior act of child

molestation specifically to prove the accused's propensity to commit the charged act of child molestation.... [MIL.R.EVID.] 414(c) state[s] that no other provision shall be construed to limit the admission of sexual offense evidence." MILITARY RULES OF EVIDENCE MANUAL at 158 (1996 Supp.). That, however, is not what the rule says. Subsection (c) states *"This rule,"* meaning 414, "shall not be construed to limit the admission or consideration of evidence under any other rule." Whatever this language means, I decline to read it as barring or limiting the application of the other rules of Section IV, especially MIL.R.EVID. 403.

In the absence of specific language, or unambiguous legislative history, to the contrary, it is not reasonable to assume or conclude that the mere existence of MIL.R.EVID. 414 either cancels MIL.R.EVID. 403, 404, or 405, or that those rules are now to be read essentially as, "except for sexual assault or child molestation cases." It would have been too easy for Congress to have said so had that been the case.

In view of subsection (c)'s lack of clarity, I believe the legislative history, such as it is, is applicable and may be consulted. With regard to subsection (c), the legislative history is consistent with my and the majority's conclusion that MIL.R.EVID. 403 *et seq.* still are fully applicable. *United States v. Sumner,* 119 F.3d 658, 661–62 (8th Cir.1997). Therefore, if I correctly read the majority opinion to conclude that MIL.R.EVID. 414 must be applied within the complete framework of Section IV, I agree with that conclusion. I now consider the mode of proffer and admission, two critical areas where the majority opinion is silent.

MIL.R.EVID. 414 also is silent on how such potentially explosive evidence will come before the factfinder. As character or reputation evidence or as evidence of other acts or offenses? As stated above, we hold that MIL.R.EVID. 403 and 404(a) still are players, 414 notwithstanding. MIL.R.EVID. 404(a) prohibits evidence of character or a trait of character which is admitted for the purpose of proving that a person acted in conformity therewith. Therefore, my understanding of today's decision is that we further hold that,

whenever a military judge rules other offenses of child molestation admissible under MIL.R.EVID. 414, such evidence shall not be admitted as character or reputation evidence contrary to MIL.R.EVID. 404(a). One reason for this holding is MIL.R.EVID. 405(a), which restricts proof of character or a trait of character to testimony of either reputation or opinion of the witness. Absent our holding in this regard, an accused may be left helpless while a witness testifies to mere rumor or other hearsay, as was the testimony in the instant case.

I also read today's decision to further hold that, if such evidence is ruled relevant and admissible by the military judge, it will be solely as evidence of other offenses and not propensity. If that is not the intent of the majority, it is certainly my position. This requirement ensures that a military judge must at least make a preliminary determination that the proffered evidence is sufficient for a reasonable court member to conclude, by a preponderance of the evidence, that the other offense or offenses in fact occurred. *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Mirandes–Gonzalez,* 26 M.J. 411 (C.M.A.1988). If the evidence clears this minimal hurdle, the military judge will then conduct the MIL.R.EVID. 403 balancing test.

How will the military judge perform the balancing test in view of MIL.R.EVID. 414? Since Congress has clearly stated a preference for admissibility, I believe the military judge must now ensure that the balancing test is performed with that preference in mind. This means that the tendency, if any, of the evidence to establish propensity will no longer weigh as heavily as it does when conducting the balance for admissibility of MIL.R.EVID. 404(b) evidence. The danger of unfair prejudice clearly must be substantially higher than the evidence's probative value. To apply this standard, the military judge should test for whether the proffered MIL.R.EVID. 414 evidence raises a substantial risk that it will cause the members not to hold the prosecution to its burden of proof of beyond a reasonable doubt as it applies *to the offense or offenses charged.*

In any limiting instruction given, the military judge will no longer instruct that the evidence is not admitted to prove the accused has a propensity to commit such offenses. Obviously, neither will the military judge instruct that the evidence is admitted for that purpose. Any limiting instruction will be limited to informing the members of the specific purpose trial counsel articulates as the basis for admissibility, and that it is not to be considered for any other purpose. This approach may be viewed as overly restrictive, but I believe it necessary to avoid very serious constitutional issues with regard to MIL. R.EVID.. 414. *See Sumner*, 119 F.3d at 661. This is especially so in light of the rule's apparent limitless reach. It does not impose a time frame for remoteness or prescribe any mode of proof. In the absence of clear guidance from the legislature, the judiciary must apply the legislation in a manner consistent with military due process. Ensuring a fair trial is the bedrock of military due process and the *raison d'etre* of the trial judiciary.

There still are other issues to be sorted out with regard to MIL.R.EVID. 414 which must await the case-by-case approach. For example, MIL.R.EVID. 403 empowers the military judge to preclude a mini-trial within the trial. For dynamite evidence such as other acts of child molestation, how much leeway should be given the defense to contest whether those acts occurred or that they were, or are, out of character? We are confident that our military judges are up to the task.

In sum, admitting MIL.R.EVID. 414 evidence can be equivalent to escalating from conventional to nuclear weapons. In those instances where such evidence may cause the members to conclude—"The issue is determined, period; case closed! What is the maximum sentence available?", the military judge must hold the line by applying MIL. R.EVID. 403. While MIL.R.EVID. 414 now makes relevance essentially a "gimme," I believe propensity still is off-limits. To repeat: until, or unless, our superior court rules otherwise, I do not believe MIL.R.EVID. 414 evidence is admissible solely as propensity evidence. I now apply what I believe are our holdings to the instant case.

Applying these factors, I conclude the military judge erred by not excluding Mrs. Hughes' testimony regarding appellant's commission of other acts of child molestation. As regards her testimony regarding the alleged abuse of her son, I note, initially, that the military judge made no articulation or finding that there was sufficient evidence to meet the *Huddleston/Mirandes-Gonzalez* admissibility test. Further, the military judge had earlier excluded this evidence under MIL.R.EVID. 804(b)(5) because it lacked indicia of reliability—the child did not tell anyone else about the allegation, the statement could refer to something other than sexual abuse, and Mrs. Hughes was in a child custody fight with the appellant. The unreliability of this evidence did not dissipate merely because the defense "opened the door," or because MIL.R.EVID. 414 liberalized the admissibility of certain evidence. The standard of proof for admissibility under MIL.R.EVID. 804(b)(5) is no more stringent than that we prescribe for 414, which is by a preponderance of the evidence. *See* R.C.M. 905(c)(1). Unreliable hearsay is still unreliable and, *ergo*, inadmissible. Nevertheless, I will continue my analysis.

The military judge also erred in ruling that this evidence was admissible as a present sense impression. A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." MIL.R.EVID. 803(1). Even a cursory reading of this rule reveals it to be inapplicable. First, it was the mental state of the witness, Mrs. Hughes, which was in issue, not another declarant. Her testimony regarding what she may have said or done on the day in question is not hearsay. Therefore, this rule may not be used to smuggle in a prejudicial belief or mental impression she may have had. Her belief regarding appellant's responsibility for abusing their child was not a statement made contemporaneously with experiencing or observing an event. *See United States v. Evans*, 23 M.J. 665, 670–72 (A.C.M.R.1986).

Similar deficiencies apply to Mrs. Hughes' testimony regarding the "other" allegations of abuse (those of her nephew, niece, and

friend's child). The military judge did not make a finding that the offenses occurred, and Mrs. Hughes' testimony, in fact, provided no evidence on which the military judge could have ruled that the members could find, by a preponderance, that the other acts or offenses in fact occurred. *See Mirandes–Gonzalez.* Further, I fail to see how Mrs. Hughes' testimony met even the relaxed relevancy test of MIL.R.EVID. 414. The relevance of this testimony should have been tested against the basis for which trial counsel sought to elicit it, which was the credibility of Mrs. Hughes.

Defense counsel was not seeking to impeach Mrs. Hughes in the classic manner envisioned by MIL.R.EVID. 608(c). All defense counsel was seeking was a basis from which he could argue to the members, not that Mrs. Hughes was testifying falsely against appellant to benefit her in her custody suit against him, but the opposite. Defense counsel sought only to extract the fact that she was seeking custody of her son so he could argue that, these factors (divorcing appellant and seeking custody of their child) notwithstanding, her testimony is that she checked on appellant and the children on some five or six occasions and observed nothing suspicious. Defense counsel was seeking to enhance Mrs. Hughes' credibility in this area, rather than attacking her truthfulness, the premise being: Mrs. Hughes would not have hesitated to reveal any wrongful conduct by appellant if she had observed any. And this is, in fact, what defense counsel asserted during closing argument on findings.

Given this basis for defense counsel's question, there was nothing from which to rehabilitate Mrs. Hughes. Allowing trial counsel to extract the highly prejudicial reason why she was seeking custody of her son was immaterial to the issue at hand *at that particular time in the trial,* MIL.R.EVID. 414 notwithstanding. Finally, even if I were to conclude that this evidence meets the applicable relevancy requirements, its unduly prejudicial impact far outweighed the probative value for which it was admitted. MIL. R.EVID. 403.

### B. Test For Prejudice

Having determined that the testimony regarding other acts of child molestation should not have been admitted, we must now test for prejudice. With error of non-constitutional dimension, we may find an error harmless if either the finder of fact was not influenced by the inadmissible evidence, or it had but a slight effect on the resolution of the case. *United States v. Barnes,* 8 M.J. 115 (C.M.A.1979); *see also United States v. Acton,* 38 M.J. 330 (C.M.A.1993); *Franklin,* 35 M.J. 311.

Applying this test, I conclude the inadmissible evidence of other alleged acts of child molestation had only a minimal impact on the members' verdict of guilty. First, the evidence against appellant is compelling. ALI's testimony is condemning. Further, notwithstanding the complexity with which this case comes to us, the essence of the prosecution's task was to corroborate appellant's admissions to Detective Perry. Appellant's feeble claim of accidentally touching the girls' genitalia is incredible and collapses under its own weight. Second, the military judge provided limited instructions each time she admitted the evidence, including a caution to the members that they were not at liberty to use the evidence as propensity evidence, which I believe is not required when giving a limiting instruction for MIL.R.EVID. 414 evidence. Therefore, I find the error in admitting the evidence discussed above harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (1994).

A couple of other comments are in order with regard to Mrs. DI's testimony regarding appellant's commission of other acts of child molestation. While I agree with the majority that, at the time the evidence was offered the military judge should not have admitted it; nonetheless, before the trial's conclusion, this evidence was rendered entirely admissible. During the defense's case on findings, trial defense counsel called Mrs. DI as a hostile witness. During her testimony, trial defense counsel elicited from her the fact that appellant had admitted to her that improper touchings occurred with the other children in question but the touchings were accidental.

First, this testimony more than satisfies the *Huddleston* test, as appellant purported-

ly admitted the other offenses in question. Second, in view of the fact that the defense of accident was in issue, one would be hard pressed to conclude the prejudicial nature of this evidence substantially outweighed its probative value. Therefore, although the majority excludes it, by my assessment, its admission obviously was harmless error since it eventually was rendered properly admissible.

With regard to the improper admission of hearsay evidence, I agree that a constitutional test for harmless error must be applied. The error must be found harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When I apply this test, I am convinced, beyond a reasonable doubt, that the impact of this evidence on the members' findings was harmless. As I noted above, ALI's testimony doomed appellant. It was clear, withstood cross-examination and, when combined with the evidence of appellant's opportunity to commit the offenses and his admissions, it alone is sufficient to convict him.

Although I find no prejudice to appellant with respect to findings, I agree that we cannot be so convinced with regard to the sentence. Even harmless error on findings may impact the sentence. *See United States v. Mann,* 26 M.J. 1, 6 (C.M.A.1988) (Everett, C.J., concurring and dissenting in part). Accordingly, I agree with the reassessment of the sentence to cure any error.

### III. OTHER ISSUES

#### A. Accident Instruction

The defense of accident clearly was placed in issue by the evidence, and trial defense counsel specifically requested the instruction. Therefore, the military judge erred in not giving an accident instruction unless it was covered by the instructions given. R.C.M. 1005(c); *United States v. Briggs,* 42 M.J. 367 (1995).

The members were instructed that they had to be convinced, beyond a reasonable doubt, that appellant acted with the intent to gratify his sexual desires and they had to consider that appellant claimed the touchings

were accidental. Therefore, appellant was not deprived of the defense of accident, as the military judge's instructions on the elements of the offense adequately included the defense. As instructed, the members could not find the specific intent to gratify his sexual desires unless they were convinced beyond a reasonable doubt that appellant's acts were not accidental. *See United States v. Barnes,* 33 M.J. 893 (A.F.C.M.R.1991). Accordingly, I agree that the military judge did not abuse her discretion by not giving the standard accident instruction.

#### B. Remaining Issues

With regard to Parts IV through X of the majority opinion, I concur only in the result.